THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SELWYN PAGE, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SELMA GEDER, Defendant-Appellant.

Fourth District   Nos. 4—86—0808, 4—86—0809 cons.

Opinion filed December 10, 1987.

Daniel D. Yuhas and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, for appellant Selwyn Page.

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant Selma Geder.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

On March 14, 1986, Phillip Wilken, a correctional officer at Pontiac Correctional Center, was stabbed by inmates, receiving serious injuries. Lawyer Pace and Christopher Robinson were charged with various counts of conspiracy to commit murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2(a), 9—1(a)(1)), conspiracy to commit aggravated battery (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2(a), 12—4(b)(6)), solicitation to commit murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—1(a), 9—1(a)(1)), and solicitation to commit aggravated battery (Ill. Rev. Stat. 1985, ch. 38, pars. 8—1(a), 12—4(b)(6)).

Selwyn Page and Selma Geder were each indicted for: one count of attempt (murder) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), two counts of aggravated battery (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(a), 12—4(b)(6)), three counts of armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2), two counts of conspiracy to commit murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2(a), 9—1), and two counts of conspiracy to commit aggravated battery (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2(a), 12—4). Following a consolidated jury trial, the court entered judgments of conviction against defendants Page and Geder on one count of attempt (murder). The defendants were each sentenced

to a term of 45 years.

Defendants appeal their conviction and in support thereof argue: (1) they were not proved guilty of attempt (murder) beyond a reasonable doubt; (2) the trial court erred in instructing the jury on the legal elements of attempt (murder); (3) the trial court improperly excluded identification testimony; and (4) the prosecutor committed reversible error by commenting on witnesses' fear of gang retaliation. We affirm.

On September 23, 1986, a jury trial commenced in the consolidated cases of Selwyn Page, Selma Geder, Lawyer Pace, and Christopher Robinson. The four defendants were charged following the stabbing of Phillip Wilken, a correctional officer, on March 14, 1986. The defendants were incarcerated at the Pontiac Correctional Center on the date of the incident. All four defendants were represented by David Ahlemeyer, public defender.

At trial, Wilken testified that on March 14, 1986, he was working in the west cellhouse of Pontiac Correctional Center. Wilken started work at 3 p.m. He was "running the feed line," which meant he was allowing inmates from each gallery to go to dinner, locking the gates as the men left and readmitting them upon return.

At approximately 4:30 p.m., Wilken admitted an inmate to gallery 8, and then proceeded up to gallery 9. Wilken let two inmates in and then continued up to gallery 10. He noticed a group of 8 to 10 inmates gathered on the staircase leading to gallery 10. As Wilken moved forward to open the gate, he was grabbed from behind. One man continued to hold Wilken as another attacked him. He was stabbed six times, the wounds being inflicted in his chest, abdomen, back, and forearm. During the attack, Wilken heard someone yell, "You're going to die."

Wilken did not see the faces of his attackers. He described them as black men dressed in outdoor clothing. Wilken was not sure of the exact number of men who were directly involved in the incident. During the attack, several inmates rushed toward him. Wilken stated that he kicked outwards, striking one inmate. He stated that he heard the sound of bones breaking.

Wilken struggled with his attackers and eventually broke free. He fled down five flights of stairs to the cage area in the center of the cellhouse. The shank which was used to stab Wilken was still imbedded in his back. Lieutenant Cox, who was stationed at the cage, immediately took Wilken to the prison health unit. At the health unit, the shank was withdrawn from Wilken's back and he was immediately transported by ambulance to St. James Hospital.

Wilken was taken to the intensive care unit at the hospital. Surgery was required. The next day he was transferred to St. Francis Hospital in Peoria. At trial, Wilken showed the jury the scars remaining from the attack. Wilken further testified that he continues to suffer from mental trauma.

Lieutenant William Cox, who was working in the cage at the time of the incident, stated that at approximately 4:30 p.m., he heard a loud scream and then heard "No. 85 is hit" on his radio. Cox indicated No. 85 was Wilken's radio number. Wilken then came rushing to the cage. Cox stated that Wilken was bleeding very seriously and he had to help carry him to the hospital. The shank was protruding from Wilken's back. Cox asked Wilken if he knew who attacked him and Wilken responded, "[I]t was the blacks."

Dr. Gregorio Manabat testified that he saw Wilken in the emergency room on March 14, 1986, at approximately 5:30 p.m. Wilken was conscious, but his blood pressure was low and he was beginning to go into shock due to blood loss. Manabat testified that Wilken had six stab wounds. One of the wounds had severed the abdominal aorta causing internal bleeding and thus necessitated surgery. Wilken's condition was diagnosed as "life threatening." Manabat indicated that after surgery he became concerned about the patient's mental stability and transferred him to St. Francis Hospital in Peoria as a result.

Richard Ores, evidence custodian at Pontiac, testified he processed the crime scene after the incident. Ores stated that he found two stocking caps and a pair of gloves in garbage cans. Ores further indicated that a winter jacket, which was found near the scene of the incident, was given to him by investigator Richard Irvin.

Diane Louise Schneider, forensic scientist with the Illinois Department of State Police, testified she analyzed blood and hair samples in connection with the case. Schneider was provided with evidence from the scene of the incident as well as blood and hair samples from Page, Geder, and Wilken. Schneider indicated that the coat and gloves contained human blood. Schneider could identify only one enzyme type in the bloodstains. She concluded that the blood could have originated from Wilken, Page, or Geder. However, Schneider further stated that the enzyme identified was present in 88.67% of all Caucasians and in 98.41% of all blacks in the United States. Schneider admitted that her findings were inconclusive and that she was unable to make any further identification of the bloodstains.

Schneider then explained the process for comparison of hair samples. She compared hair samples from the two stocking caps with hair samples from Geder, Page, and Wilken. Schneider indicated that one

stocking cap contained a head hair of Negroid origin which was consistent with the hair of Page. The cap also contained hairs of Negroid origin which were dissimilar from both Page and Geder. The second stocking cap contained one head hair of a Caucasian which was dissimilar from that of Wilken, and two head hair fragments of Negroid origin that were consistent with the hair of Page. Other hair fragments found on the second stocking cap were dissimilar to the hair of either Page or Geder. Again, Schneider admitted the inconclusive nature of her findings.

The remainder of the State's case consisted, in large part, of testimony of inmates at Pontiac. Dennis Ferguson testified that on March 14, 1986, he saw Wilken running down the stairs with a knife protruding from his back. Ferguson stated that he did not see the attack and could not identify any specific inmates as being near the scene of the incident. Ferguson indicated that he talked to investigators following the incident and was shown a series of photographs. Ferguson identified a number of photographs which portrayed people he witnessed near the scene of the incident. At trial, however, Ferguson stated he did not know whether he had identified any of the defendants.

Courtney Gibson stated he was near the scene of the incident. Gibson claimed that he turned around to see Wilken getting stabbed, but quickly turned back the other way. Gibson did state that one inmate was holding Wilken while another one stabbed him with a shank. The attackers were dressed in outdoor clothing, wearing blue coats and hats. Gibson witnessed the attackers flee down the stairs. Gibson noted there were many other inmates in the area, but he specifically identified Wilbur Cooley and Stanley McMath (Smokey).

Stanley McMath (Smokey) testified he is a member of the "Brothers of the Struggle" gang (BOS). McMath indicated that his position in the gang was that of a foot soldier, a low ranking position. McMath stated he was a friend of Wilbur Cooley, chief of security for the BOS. McMath indicated that at approximately 4 p.m. on the date of the incident he was coming off gallery 10 when Cooley approached and asked him to stay on the flag. McMath identified several other inmates who were near the scene, specifically Peter Gunn (Geder), Junior (Page), and an inmate named Frog. McMath stated that he saw Officer Wilken approaching the 9-10 flag. A few minutes later, Page grabbed Wilken from behind, and Geder stabbed Wilken. Wilken kicked one of the attackers, broke away, and fled down the stairs. McMath stated that Page was wearing an outdoor coat similar to People's exhibit No. 6, a stocking cap and white gloves. Geder was also

wearing a coat and hat. McMath testified that although Cooley was present at the scene of the incident, he did not participate in the attack.

McMath further testified that he was interviewed subsequent to the incident, during which time he identified the attackers from a series of photographs. The parties stipulated that McMath was no longer at Pontiac, but had been moved to a different institution. When questioned regarding his transfer, McMath indicated he requested the transfer due to fear of reprisal. McMath stated, "They would do the same thing to me."

Wilbur Cooley testified that he was a member of the Black Gangster Disciples, an affiliate of the BOS. Approximately 10 days prior to the attack, Cooley was appointed chief of security, thus making him responsible for the protection of gang members from other inmates. Cooley was appointed to this position by Lawyer Pace. Cooley, however, did not believe he was actually chief of security. He felt he was being set up as a "fall guy."

On Wednesday, March 12, 1986, Lawyer Pace told Cooley to arrange a "hit" on a correctional officer. Cooley was told to specifically ask inmates Darrell Hilliard (Nose) and Delvin Jackson (Foots) to make the hit. The officer was to be hit because the administration was hassling inmates, writing "bogus" tickets, and putting the prison on lockup without justification. Pace also indicated that the officer was only to be stabbed once and was not to be killed. Pace further informed Cooley that the order for the hit was coming down from "G-don," the "unit coordinator" for the west cellhouse. Cooley was informed that any correctional officer could be hit with the exception of Officer Mesch, who had recently written a disciplinary ticket against Pace and would thus suspect his involvement. Cooley agreed to cooperate with Pace. At trial, Cooley testified he felt he had no other choice.

Cooley was instructed to obtain a shank from "Greedyman" (Coleman), who lived on gallery 5. Coleman informed Cooley that the shank would be in a desk inside a cell. On March 14, 1986, Cooley, along with another inmate, Rodney McNeary, moved the desk from Coleman's cell. At this time, Cooley came into possession of the shank used in the incident. The shank was later given to Geder to be used in the attack.

On Friday morning, both Nose and Foots informed Cooley that they were not going to do the hit. Cooley then informed Christopher Robinson about the hit. Cooley told Robinson that the inmates originally intended to carry it out had backed down. Robinson then offered

his services, but Cooley refused his offer. Cooley told Robinson to find someone else to make the hit. According to Cooley, Robinson was his assistant and was required to follow his orders. Meanwhile, Cooley indicated Geder had volunteered to replace one of the inmates who was supposed to do the stabbing. Robinson recruited Selwyn Page to participate in the stabbing.

At approximately 4:30 p.m., Cooley went to the 9-10 flag. Page, Geder, and McMath were already on the flag. Cooley indicated that he went to gallery 9 to obtain some marijuana and to establish an alibi. Cooley, however, could not find the person from whom he was supposed to obtain the drugs, and returned to gallery 9. Cooley was on the 9-10 flag when he witnessed Wilken approach. Cooley stated that Wilken was attacked by Page and Geder, who were wearing blue stocking caps, white gloves, and blue coats. Cooley stated that Page grabbed Wilken by the neck from behind and Geder stabbed him. Wilken struggled and then kicked Geder three or four times.

Cooley testified that after the attack, Geder and Page ran down the stairs. Cooley, however, remained on the flag, indicating that if he had moved he would have stepped in the blood, thereby implicating himself. At trial, Cooley insisted that he had not gone to the 9-10 flag to supervise the hit.

Cooley stated that he was a "dead man" because he had chosen to testify. Cooley stated that he decided to testify upon the realization that he had been set up as a "fall guy" and would not take the fall alone. Cooley further indicated he had received preferential treatment for testifying. He has been transferred from Pontiac at his own request, and admitted that while he still faced charges for his involvement in the incident, he hoped to be treated more leniently due to his cooperation.

On cross-examination, Cooley admitted when he was first questioned immediately after the incident, he stated that he knew nothing. Cooley was then interviewed a few days later and again denied being involved in the attack. The third time Cooley was questioned, he decided to confess. Cooley stated he was prompted to confess when he was informed of evidence connecting him to the incident. Cooley claimed he did not tell the truth at first because he was afraid. Moreover, he believed his connection to the incident was not apparent. However, during the third interview, Cooley realized the authorities were aware of his involvement.

Nose and Foots, both members of BOS, corroborated the fact that Cooley asked them to attack a correctional officer. Both indicated that Geder was present with Cooley when they were asked to make the

hit. Both inmates refused to be involved because they were close to being paroled.

The State's final witness was investigator Douglas Read from the Illinois Department of Corrections. Read stated that he interviewed Ferguson subsequent to the incident. Ferguson picked out three photographs of people who were on the landing at the time of the incident. Read indicated that one of the photographs chosen was that of Selwyn Page.

Read indicated that following the incident, the institution was on lockdown for approximately 10 days during which the investigation was conducted. Read testified he interviewed approximately 185 inmates and staff members. Read stated that there was no indication of any inmate complaining of physical injuries.

The defense presented inmate Rafael Ramierez, who testified through a translator, stating he overheard some people say they were going to "hit" an officer because they were writing too many disciplinary tickets. Ramierez testified that after the attack he spoke with investigator Read and was shown a number of photographs. Ramierez admitted selecting two photographs, but at trial claimed he was not sure whether they portrayed the people who attacked the officer. Ramierez thought he selected the pictures of the people he overheard talking rather than the people who carried out the attack. He further stated that he knew the four codefendants only by sight, and was unaware of their gang affiliation.

Investigator Read testified that he showed Ramierez photographs of inmates from gallery 10 when Ramierez indicated he overheard three black inmates discussing the attack of a correctional officer. At this point defense counsel attempted to have Read state the names of the persons identified by Ramierez, but the court sustained a hearsay objection.

Rodney McNeary, an inmate, stated that he knew Wilbur Cooley, but did not help him move a desk. McNeary knew a person named Greedyman, but never helped Greedyman move a desk. McNeary knew nothing about the attack on Wilken.

Joseph Hall, an inmate, stated that although he knows Wilbur Cooley, he never sold any drugs to Cooley on March 14, 1986. Hall indicated he had no gang affiliation, was unaware of the incident, and did not speak with Cooley on the date of the incident.

Eddison Sardon, an inmate, also indicated that he knows Wilbur Cooley, but did not speak with Cooley on the date of the incident. Sardon stated that Cooley did not approach him seeking drugs on that particular date.

Each defendant took the stand in his own behalf. Lawyer Pace testified that he had been previously convicted of murder and burglary, and was in Pontiac on March 14, 1986. Pace indicated that he knew Cooley, but was unaware of Cooley's gang affiliation. Pace claimed he first heard of the attack on Wilken when the cellblock went under deadlock. Pace stated that he did not participate in the attack in any way, that he did not order Cooley to arrange the attack, and that he did not arrange for Cooley to obtain a weapon. Pace stated that he did not know the meaning of the terms "unit coordinator" or "chief of security." Pace admitted to being a member of BOS, but denied being the chief of security. Pace stated that he knows Officer Wilken, but generally had no problems with any of the correctional officers. Pace stated that he was never in possession of a shank.

Christopher Robinson testified he heard about the incident while working in the kitchen. Robinson denied having any conversation with Cooley. Robinson admitted to being a member of BOS, but denied being Cooley's assistant. Robinson stated that he had no knowledge of ranking among gang members, that he did not know of any other inmate's gang affiliation, and did not know of a "code of silence."

Selma Geder testified that he first learned of the attack when the cellhouse went under lockdown. Geder testified that his nickname was "Peter Gunn." Geder indicated that he was not a gang member and never had been. He stated he knew Cooley, whom he suspected was a gang member based upon the people he associated with. Geder testified that Cooley never asked him to attack an officer, that he never volunteered to participate in a "hit," and that he did not have anything to do with the attack on Officer Wilken.

Selwyn Page testified that he first learned of the attack when the lockdown went into effect. He was on gallery 3 at the time. Page stated that he did not know Wilbur Cooley, although he had seen him in prison. Page testified that neither Cooley nor Robinson ever asked him to participate in an attack on an officer, and that he did not attack any officer or help anyone attack an officer. Page stated that People's exhibit No. 6, a jacket which was confiscated during the investigation, was his. He claimed, however, the jacket was soiled when he received it. Page had no knowledge of any bloodstains on the jacket, but stated he had not checked the jacket for stains prior to wearing it. Page further indicated he wore the jacket when interviewed, and would not have done so had the blood on the jacket been a result of his participation in the assault.

Page stated that he does not have a stocking cap, that he was un-

aware of any ranking in the gangs, and that he did not know any other gang members.

In rebuttal, the State presented the testimony of Kent Wright, an inmate at Pontiac. Wright indicated he was a member of the Disciples, a subgroup of BOS. Wright claimed he knew many members of BOS, including Page, Geder, Pace, and Robinson. Wright indicated that he also knows Cooley, a member of BOS with the rank of chief of security. Wright noted affiliation with BOS is obvious in prison based upon the activity of the members. Membership in BOS is known by gang members as well as other inmates. According to Wright, gangs have internal ranking systems which include different positions. BOS ranking includes positions of gallery coordinator, treasurer, chief of security, gallery security, and unit coordinator, the highest rank of all.

REASONABLE DOUBT

Defendants Page and Geder maintain the evidence adduced at trial was insufficient to prove guilt beyond a reasonable doubt. In support thereof, the defendants claim the physical evidence presented was inconclusive and the entire State's case hinged upon the testimony of Wilbur Cooley, an admitted liar and accomplice, who testified with the expectation of prosecutorial leniency for charges pending against him.

■ The standard of review of criminal convictions is well established. A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) In *Collins*, the Illinois Supreme Court adopted the standard as enunciated in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, quoting:

" '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

■ The testimony of an accomplice, either corroborated or uncorroborated, can be sufficient to sustain a conviction if the jury is con-

vinced beyond a reasonable doubt. (*People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375; *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291.) Whether such testimony forms a sufficient basis for conviction goes to the weight of the evidence. As such, it is properly a function within the province of the jury. *Newell*, 103 Ill. 2d 465, 469 N.E.2d 1375; *Wilson*, 66 Ill. 2d 346, 362 N.E.2d 291.

Although accomplice testimony is competent, it is often fraught with serious problems. The accomplice may have been promised leniency or harbor ill will towards the accused. Consequently, it only should be accepted with the utmost caution and subjected to the highest scrutiny. *Newell*, 103 Ill. 2d 465, 469 N.E.2d 1375; see also *People v. Krankel* (1985), 131 Ill. App. 3d 887, 476 N.E.2d 777.

At trial, the State's main witness, Wilbur Cooley, freely admitted his participation in the plan to "hit" a correctional officer. Cooley, chief of security of BOS, was asked to arrange the hit. He was to obtain the weapon and find two inmates to carry out the attack. After the two inmates originally intended to perform the task refused, Cooley sought the help of his assistant, Christopher Robinson. Robinson recruited Page to participate in the stabbing. Cooley personally spoke with Page and confirmed the fact that Page was willing to cooperate.

Cooley further testified that Geder volunteered to participate in the attack after Hilliard (Nose) and Jackson (Foots) declined. Cooley personally gave Geder the shank used in the stabbing. Both Hilliard and Jackson corroborated the fact that Cooley asked them to participate in the attack. They stated that Geder was with Cooley when the conversation occurred.

Cooley was standing on the 9-10 flag when Officer Wilken was hit. He saw Page grab Wilken from behind as Geder stabbed him. Cooley stated Wilken kicked Geder three or four times during the attack, struggled with the inmates, and then broke away, fleeing down the stairs. Page and Geder, who were both dressed in outdoor clothing with stocking caps pulled down, also fled down the stairs.

On cross-examination, Cooley did admit that he initially lied to prison investigators. Cooley further stated that he had also been indicted for his participation in the incident and hoped for leniency due to his cooperation. There was, however, no evidence of any promises or deals between Cooley and the prosecutor. Additionally, the record fails to reflect any particular motive on behalf of Cooley for testifying against the defendants. Cooley was well aware of the risks involved in testifying against his fellow inmates.

Stanley McMath, an inmate at Pontiac, corroborated Cooley's tes-

timony. McMath, a friend of Cooley's, was standing with Cooley on the 9-10 flag when the incident occurred. McMath, a member of BOS, testified that he witnessed Page grab and Geder stab Wilken. According to McMath, Page and Geder were dressed in blue outdoor jackets and were wearing stocking caps.

While the testimony of Cooley, standing alone, could be sufficient to support the convictions, it was further corroborated by the testimony of Stanley McMath. In *People v. Amos* (1985), 140 Ill. App. 3d 14, 488 N.E.2d 290, five inmates at Stateville were indicted for murder. At the trial of two defendants, the three remaining codefendants testified to the circumstances surrounding the murder. The codefendants, as Cooley herein, had all made prior inconsistent statements to prison investigators and had all hoped to procure leniency in return for their cooperation. The court, in upholding their convictions, stated that it was the duty of the jury to resolve contradictory evidence and weigh the credibility of the witnesses. Although there were some discrepancies in testimony, the court found that the essential elements of murder were proved beyond a reasonable doubt.

■ The jury herein was fully apprised of potential credibility problems. It was the duty of the jury to assess the evidence and weight to be afforded to the testimony presented. It is of importance to note that these types of cases involving crimes in prisons are inherently fraught with credibility problems. Where one inmate comes forward to confess participation in a crime thereby implicating his cohorts, his motive for testifying must be strictly scrutinized. The defendants here presented no evidence to indicate Cooley had a particular motive for testifying which outweighed his truthfulness. Additionally, the reality of gang retaliation and internal repercussions gives further credence to the testimony of Cooley. Viewing all of the evidence per *Collins*, there is sufficient proof in support of defendants' convictions for attempt (murder).

JURY INSTRUCTIONS

The jury was instructed as follows with respect to the crime of attempt (murder):

> "A person commits the offense of attempt when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder.
>
> The offense attempted need not have been committed.
>
> A person commits the offense of murder when he kills an individual (without lawful justification) if, in performing the acts

which cause the death,

> (1) he intends to kill that individual or another; or
>
> (2) *he knows that such acts will cause death to that individual or another.*" (Emphasis added.)

Since a conviction for attempt (murder) requires a specific intent to kill, defendants Page and Geder maintain the jury was erroneously instructed thereby requiring reversal.

The State initially asserts waiver. It is well established that the failure to object to a tendered instruction during trial or to specifically raise the issue in a post-trial motion will constitute waiver of the issue for purposes of appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.) However, under Supreme Court Rule 451(c) (107 Ill. 2d R. 451(c)), substantial defects in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Since an alleged error in instructing the jury of the elements of a crime charged poses potential for deprivation of a fundamental right, we deem the waiver rule inapplicable here. See generally *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.

■ The offense of attempt (murder) requires the mental state of specific intent to commit murder. (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(a), 9—1(a).) Any lesser form of intent is insufficient. Thus, knowledge that the consequences of one's conduct may result in death is not enough; a specific intent to kill is required. (*People v. Jones* (1979), 81 Ill. 2d 1, 9, 405 N.E.2d 343, 346, citing *People v. Trinkle* (1977), 68 Ill. 2d 198, 201-04, 369 N.E.2d 888, 889-92.) While one need not intend to take life to commit murder, one must so intend to be guilty of attempt (murder). *Trinkle*, 68 Ill. 2d 198, 369 N.E.2d 888.

■ The Illinois Supreme Court has continued to hold that instructions must make it clear that to convict for attempt (murder) nothing less than criminal intent to kill must be shown. (*Jones*, 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *Trinkle*, 68 Ill. 2d 198, 369 N.E.2d 888; see also *People v. Cloyd* (1987), 152 Ill. App. 3d 50, 504 N.E.2d 126.) The rationale underlying this strict requirement is that the inclusion of "bodily harm" language or "knowledge" language improperly allows the jury to return a verdict of guilty upon evidence that the defendant acted without a specific intent to cause death. *Harris*, 72 Ill. 2d 16, 377 N.E.2d 28.

Subsequent to the supreme court holdings in *Trinkle* and *Jones*, several appellate courts have held that knowledge that one's acts will cause death or knowledge that one's acts create a strong probability of death satisfy the intent to kill requirement for attempt (murder).

(See *People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 457 N.E.2d 1300; *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206; *People v. Morano* (1979), 69 Ill. App. 3d 580, 387 N.E.2d 816.) In *People v. Kraft* (1985), 133 Ill. App. 3d 294, 478 N.E.2d 1154, however, the court traced the development of the attempt (murder) instruction issue and deemed that the cases which allow knowledge in lieu of specific intent are in direct contradiction with the Illinois Supreme Court cases of *Jones, Trinkle,* and *Harris.* The *Kraft* court further noted that statutory definitions of attempt do not support the proposition that knowledge and intent are equivalent and thus interchangeable mental states. (*Kraft,* 133 Ill. App. 3d at 302, 478 N.E.2d at 1160.) Thus, the current trend to which we are inclined to adhere requires the jury to be instructed that a conviction for attempt (murder) requires specific intent to kill. Consequently, the trial court herein did not properly instruct the jury.

Although the jury must be properly instructed with respect to the requisites for attempt (murder), an error in instructions does not necessarily mandate reversal. (*Jones,* 81 Ill. 2d at 8-9, 405 N.E.2d at 346.) When the evidence of the defendant's guilt is clear and convincing and the jury could not reasonably have found the defendant not guilty, any error in giving or refusing to give instructions will not justify reversal. (*Jones,* 81 Ill. 2d 1, 405 N.E.2d 343; *Cloyd,* 152 Ill. App. 3d 50, 504 N.E.2d 126.) In *Jones,* the supreme court determined that since the defendant's intent to commit murder was blatantly evident from the circumstances of the case, any error in instructing the jury with respect to intent to commit murder was harmless.

The defendants' reliance upon cases which fail to apply harmless error are factually distinguishable. (*People v. Gentry* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963 (defendant's intent to kill not clearly apparent where he splashed gasoline on victim which ignited during argument); *People v. Cantu* (1987), 157 Ill. App. 3d 934, 510 N.E.2d 1183 (defendant's intent to kill not clearly apparent where he fired at State trooper's vehicle); *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026 (defendant's intent to kill not clearly apparent where defendant and accomplices were involved in shooting).) The circumstances surrounding the stabbing of Wilken, specifically the seriousness of the injuries inflicted and the repetitive nature of the attack, are sufficient to establish a clear and convincing intent to kill.

IDENTIFICATION TESTIMONY

At trial, the defense presented the testimony of Rafael Ramierez,

an inmate at Pontiac, who previously identified photographs of two inmates. The photos were of inmates other than the four defendants. The defense attempted to establish that the photos were of the inmates who stabbed Wilken. At trial, however, Ramierez stated that the two photos were of inmates he overheard discussing the possible attack of a correctional officer. Ramierez denied that the inmates identified were involved in the attack on March 14, 1986. In fact, Ramierez claimed he had no knowledge of the incident.

Investigator Read then testified that he showed Ramierez photos pursuant to his investigation of the incident. Ramierez told Read that he overheard three black inmates talking about attacking a correctional officer. The inmates were sharpening a knife as they spoke. Ramierez chose two photos depicting men he overheard. The photos did not have inmate names printed on them. Read indicated the photos were numbered to correspond to an inmate roster. Neither Read nor Ramierez knew the names of the inmates in the photos. At this point, Read was asked which inmates were identified by Ramierez. The State objected on hearsay grounds and the court sustained the objection. The defense failed to produce the pictures and did not request that the State produce the pictures at trial.

On appeal, the defendants maintain the court's ruling disallowing Read's testimony denied them the opportunity to present crucial evidence in support of their defense. The defendants claim that Read's testimony was not hearsay, but admissible as a prior identification pursuant to section 115—12 of the Code of Criminal Procedure of 1963. Ill. Rev. Stat. 1985, ch. 38, par. 115—12.

It is undisputed that a defendant is entitled to present evidence which proves the guilt of another for the crime with which he is charged. In doing so, however, the defendant must comply with established rules of evidence and procedure so that the fairness of the proceedings is assured. See *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038; *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

■ Section 115—12 of the Code of Criminal Procedure of 1963 is specifically directed at the substantive admissibility of prior identifications, providing:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." (Ill. Rev. Stat. 1985, ch. 38, par. 115—12.)

This rule is applicable where a witness makes an out-of-court identification and then testifies to that identification in court. Where the declarant is unable to reiterate circumstances surrounding the initial identification, a police officer or other party who observed the declarant make the identification may testify to specific details. (*People v. Hudson* (1985), 137 Ill. App. 3d 606, 484 N.E.2d 1246; *People v. Thompson* (1981), 93 Ill. App. 3d 45, 416 N.E.2d 1105; *People v. Gan* (1979), 75 Ill. App. 3d 72, 394 N.E.2d 611; see also *United States v. Elemy* (9th Cir. 1981), 656 F.2d 507; Fed. R. Evid. 801(d)(1)(C) (28 U.S.C. App. 715 (1982)) permits in-court testimony of out-of-court identification by party other than the declarant).) Both the officer and the declarant must be present in court subject to cross-examination to assure the reliability of the statement. *Hudson,* 137 Ill. App. 3d 606, 484 N.E.2d 1246.

Ramierez did testify to identifying two inmates who were contemplating an attack upon a guard. Read was present when the identification occurred. Both testified to the circumstances of the out-of-court identification and were subject to cross-examination. As defendants indicate, the court allowed similar identification testimony during the State's case in chief when inmate Ferguson testified. The testimony is of the nature contemplated as nonhearsay by section 115—12.

■ The commission of errors during trial do not always mandate reversal upon appeal. Where the trial court improperly excludes identification testimony, the error will be deemed harmless if the identification of the defendants has been proved beyond a reasonable doubt. (*Thompson,* 93 Ill. App. 3d at 50-51, 416 N.E.2d at 1109-10, citing *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) While the identification of the defendants as the perpetrators of the crime herein was an issue at trial, there was corroborated testimony linking the defendants to the attack. As such, the error was harmless.

COMMENTS ON GANG RETALIATION

Throughout trial, each inmate who testified was questioned regarding the existence of gangs in prison, any personal affiliation with a gang, and the fear of testifying in general. During the State's opening and closing arguments, the prosecutor commented upon the membership of the defendants in BOS and theorized that the attack upon Officer Wilken was in fact the result of a gang conspiracy.

On appeal, the defendants maintain that the questioning of inmates with respect to fear of gang retaliation and the comments made by the prosecutor during argument constitute reversible error.

The State initially maintains this issue has been waived for purposes of appeal. It is a well-established principle that a defendant's failure to object during trial or in a post-trial motion constitutes waiver of the issue upon review. (*People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339.) The waiver rule, however, is relaxed where it is plainly apparent that justice has been denied or resultant verdict was a product of the alleged error. (*Adams*, 109 Ill. 2d 102, 485 N.E.2d 339, citing *People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369; 107 Ill. 2d R. 615(a).) This exception, however, is limited in application and should only be utilized to correct grave errors or when required by fundamental fairness. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

Evidence of the existence of gangs in prison and the ramifications of inmates testifying against gang members was presented throughout the entire trial. The defendants, however, failed to object to this testimony. The issue was not raised in defendants' post-trial motion. As such, the issue is waived for purposes of appeal.

Regardless of waiver, on the merits, while it is highly improper for a prosecutor to comment on a witness' fear of testifying or a fear or retaliation by a defendant, such evidence will only constitute reversible error when the impropriety results in substantial prejudice to the defendant. (*People v. Trass* (1985), 136 Ill. App. 3d 455, 483 N.E.2d 567.) The comments made by the prosecutor herein referred to a vague and generalized fear of gang retaliation. There was no specific evidence linking any of the defendants to threats made to the witnesses. The comments made during closing argument were supported by evidence adduced at trial. As such, any error was not of such a prejudicial nature so as to require reversal.

Based on the foregoing, the decision of the circuit court of Livingston County is affirmed.

Affirmed.

KNECHT and SPITZ, JJ., concur.