THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL KRAFT, Defendant-Appellant.

First District (1st Division)   No. 83—2388

Opinion filed May 20, 1985.

Steven Clark and Karen Michels, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Maureen A. Harton, and Karyn Stratton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Paul Kraft was found guilty on two counts of attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—4) and two counts of armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2). The attempted murder convictions were merged with the armed violence convictions, and defendant was sentenced to 10 years' imprisonment on each count, the sentences to run concurrently. On appeal, defendant contends that the jury was improperly instructed on the required mental state for attempted murder where the instructions given would permit a conviction upon a finding that defendant knew his acts created a strong probability of death to another. We agree the instructions were erroneous and reverse and remand for a new trial.

Evidence produced by the State reveals that Mr. and Mrs. Roderick Grossi, aged 71 and 62 years respectively, were on their way home from a Sunday drive on July 24, 1982, at about 7:40 p.m. They were proceeding on Monee Road when Mr. Grossi saw a truck parked in a driveway. As Mr. Grossi's car approached the truck, the driver of the truck backed out into the road in front of his car. Mr. Grossi put on his brakes, and the truck started moving very slowly. Mr. Grossi blew his horn, put on his indicator and started to pass the truck. As he entered the left lane of the two-lane road, he accelerated, as did the driver of the truck. The truck came close to Mr. Grossi's car and, in order to avoid hitting the other vehicle, Mr. Grossi went off of the

road into a ditch. He maneuvered the car out of the ditch and started going east again. After travelling a short distance, he saw the truck parked ahead on the road. Mr. Grossi decided he wanted to talk to the driver and pulled up very close to the truck. As he was pushing the window button he looked up and saw a gun pointed at him by the driver of the truck, later identified as defendant. Before Mr. Grossi had a chance to say anything, defendant fired a shot over the Grossi's car, which was within four feet of defendant's truck. Mrs. Grossi ducked down and yelled to her husband that defendant had a gun. Mr. Grossi stepped on the accelerator and heard two or three more shots. Defendant's truck was right behind the Grossis' car at this time. A bullet hole was later discovered in the right rear tail lens of the Grossis' car. The bullet was recovered from the trunk of the car.

As Mr. Grossi approached Western Avenue he saw a police car going northbound. He put his hand on the horn and kept it there until he reached the officer's car. Officer John Lancaster of the Park Forest police department asked Mr. Grossi what was wrong. Mr. Grossi explained that defendant had been shooting at them.

Officer Lancaster, who was in uniform and driving a marked squad car, turned his car around and approached defendant's truck. He stopped his squad car within 30 to 40 feet of defendant's truck and started to get out of the car. As he was getting out, defendant pointed a gun at him through the window. Officer Lancaster crouched behind the open door of his squad car and ordered defendant to drop the gun. He repeated the order a second time, at which time defendant fired a shot. Officer Lancaster ducked down behind the door, and defendant then fired a second shot. Lancaster shot back and moved to the back of his car to reload. As he did, defendant turned his truck and proceeded southbound on Western Avenue. Officer Lancaster got in his car and followed him. He neared Exchange Avenue and saw defendant's truck stopped near a roadblock. Defendant reached out and fired several shots at the officers that were blocking the road. Lancaster got out of his squad car and fired several shots at the truck. Defendant's truck tires were shot flat and Officer Lancaster approached the truck. He got within 10 feet of the truck and saw defendant lying across the front seat reloading his gun. Lancaster called out that defendant was reloading and then ducked behind cover. As he moved behind cover, defendant fired several more shots. Defendant subsequently threw out his gun and was removed from the truck. He had been wounded in the face and neck. One of the police officers performed a tracheotomy because defendant could not breathe.

Defendant testified that Mr. Grossi's car initially approached his truck at a very fast rate of speed, and consequently Grossi had to slam on the brakes when defendant backed out of the driveway. He thought he heard breaking glass and then saw the Grossis' car swerve off the road. Defendant denied forcing the Grossis' car off the road. Defendant testified that when the Grossis' car pulled up next to him after they had swerved off the road, Mrs. Grossi was smiling at him and Mr. Grossi was bent over yelling something. Defendant could not hear what Mr. Grossi was saying and claimed that he became very afraid and pulled out a gun and fired it over their car. Defendant admitted firing a few more shots in the "general direction" of the Grossis' car as they drove away. Defendant claimed he only intended to scare them away and he thought they might have had a gun "or something." Defendant stated that when he thought about what he had done, he was in shock. He claimed he fired at Officer Lancaster because "he just wanted to die" after he realized what he had done to Mr. and Mrs. Grossi.

Defendant's father, Harley Kraft, defendant's friend, Joseph Butz, and defendant's employer, William Jenkins, testified on defendant's behalf. Harley Kraft and Butz both stated that defendant was a good marksman. Butz testified that on three occasions he and defendant had shot tin cans. Butz rated defendant's accuracy as good, stating that defendant would hit the target 8 out of 10 times from a distance of 30 or 40 feet and 6 or 7 times out of 10 from a distance of 50 feet. All three witnesses described defendant as mild, timid and basically nonviolent. Jenkins testified that during the two weeks prior to the shooting incident, defendant appeared upset and tense.

Defendant also presented expert testimony on his mental condition. Dr. Albert Stipes testified that he had examined defendant on two occasions and diagnosed him as having a schizotypal personality disorder with depression and a history of drug abuse. He explained that a person with this condition tends to be socially withdrawn, somewhat eccentric, but still in contact with reality and not psychotic. Such an individual also exhibits symptoms of depression, sadness, low self-esteem and some suicidal thinking.

Dr. Stipes further testified that during these interviews defendant related some details of the shooting incident. Defendant indicated that he had been drinking and smoking marijuana and that he was "high but not drunk." He was on his way to a friend's house when another car passed him very fast and he said he felt the occupants were harassing him. Defendant told Dr. Stipes that he pursued and fired at the occupants of the car to scare them but then became fearful that they

would tell the police and he would be arrested. He became so depressed at this prospect that he decided to commit suicide by letting the police shoot him. Defendant further stated that when he was confronted by the police, he shot in various areas, not intending to shoot or harm anyone. Based upon these statements and other available information, Dr. Stipes testified that he was of the opinion that defendant was sane at the time of the incident and that he had full knowledge and was aware of what he was doing. Dr. Stipes also testified that he thought defendant was not malingering or feigning a psychiatric disorder.

From the foregoing, it is clear that defendant's entire defense was predicated on the theory that he never intended to kill anyone and therefore he lacked the required mental state for attempted murder. Defendant contended that he never aimed his gun to injure anyone and if he had he would have hit his target because he was a good marksman. He further argued that he shot at the police hoping he, himself, would be shot. Accordingly, the question of jury instructions on the required mental state for attempted murder is of critical importance.

The record reveals that the following instructions were given to the jury:

"A person commits the offense of murder when he kills an individual if, in performing the acts which cause the death,

he intends to kill that individual;

or

he knows that such acts will cause death to that individual;

or

he knows that such acts create a strong probability of death to that individual."

"A person commits the offense of attempt murder when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder.

The offense attempted need not have been committed."

Judging from the number of decisions addressing this issue, the proper jury instructions for attempted murder have served as a continuing source of confusion and uncertainty among members of the bar. (See generally 28 De Paul L. Rev. 157 (1978).) All authorities agree that the crime of attempt is a specific-intent crime and "[a]n instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (*People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28.) However, problems

have arisen in the past from the fact that in an attempted murder trial the jurors must be instructed not only on the crime of attempt (Ill. Rev. Stat. 1983, ch. 38, par. 8—4) but also on the target crime attempted, here murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1; *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446).

The crime of murder is defined in our statute as follows:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a).

The crime of attempt has been statutorily defined as follows:

"A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." Ill. Rev. Stat. 1983, ch. 38, par. 8—4.

From the above, it is clear that a discrepancy exists between the culpable mental state for attempt, which requires an intent to commit the offense, and the alternative culpable mental states for murder, which include not only intent to kill another, but also intent to do great bodily harm (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)), or knowledge that one's acts create a strong probability of death or great bodily harm (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)). Noting this discrepancy, several Illinois Supreme Court cases have reversed attempted murder convictions where the definitional murder instruction included some alternative culpable mental state other than intent to kill.

In *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, the supreme court reversed an attempted murder conviction where the jury was given a definition of murder which stated that one commits murder if he knows that his acts "created a strong possibility of death or great bodily harm." (68 Ill. 2d 198, 200.) The court held that the instructions were improper because they permitted the jury to find the defendant guilty of attempted murder if it concluded that the defendant knew his acts created a strong probability of great bodily harm to another person even if the evidence did not show that the

defendant had acted with intent to kill. 68 Ill. 2d 198, 201.

The "probability of death or great bodily harm" instruction was also given in one of the consolidated appeals in *People v. Harris* and *People v. Shields* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, and the attempted murder conviction in the *Shields* case was reversed. In the *Harris* portion of the consolidated appeal, the jury was given a definition of murder which stated that one commits murder if "he intends to kill or do great bodily harm." (72 Ill. 2d 16, 20.) As in *Shields* and *Trinkle*, the court found the inclusion of the "bodily harm" language improper because it permitted the jury to return a verdict of guilty upon evidence that defendants intended only to cause great bodily harm short of death. 72 Ill. 2d 16, 27.

Subsequent appellate court cases have dealt with the issue of whether either knowledge that one's acts will cause death or knowledge that one's acts create a strong probability of death satisfy the mental state requirements for attempted murder. In *People v. Morano* (1979), 69 Ill. App. 3d 580, 387 N.E.2d 816, the court reviewed an attempted murder conviction where the jury was given an instruction which stated that one commits murder if "he knows that such acts will cause death to that individual or he knows that such acts create a strong probability of death to that individual." (69 Ill. App. 3d 580, 585.) The court held that knowledge that one's actions create a strong probability of death sufficiently satisfied the intent to kill requirement for attempted murder and upheld the conviction. Subsequent appellate opinions have followed *Morano. People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 457 N.E.2d 1300; *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066; *People v. Stokes* (1981), 95 Ill. App. 3d 62, 419 N.E.2d 1181; *People v. Hancock* (1980), 83 Ill. App. 3d 700, 404 N.E.2d 914.

The validity of *Morano* has been called into question by the recent Illinois Supreme Court opinion in *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343. There, the court again reviewed an attempted murder conviction where the "great bodily harm" language was included in the definitional murder instruction given to the jury. The court followed its previous decisions in *Trinkle* and *Harris*, finding the instruction improper, and commented broadly on the required mental state for attempted murder, noting:

> "The offense of attempted murder requires the mental state of specific intent to commit murder, to kill someone. Section 8—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 8—4(a)) clearly sets this out: 'A person commits an attempt when, with intent to commit a specific offense, he does any act

which constitutes a substantial step toward the commission of that offense.' *Knowledge* that the consequences of an accused's act may result in death (or grave bodily injury), or intent to do bodily harm, is not enough; specific intent to kill is required *(People v. Trinkle* (1977), 68 Ill. 2d 198, 201-04). Both the indictment and the instructions must unambiguously reflect this. (68 Ill. 2d 198, 201-04.)" (Emphasis in original.) (81 Ill. 2d 1, 8-9.)

The court went on to contrast the mental state requirements of attempted murder and murder:

"The offense of murder, on the other hand, does not always require specific intent to kill. Specific intent to do grave bodily harm or knowledge that one's actions will cause or could cause death or bodily harm are also sufficient mental states for murder. Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)." (81 Ill. 2d 1, 9.)

From the above-quoted language it would appear that *knowledge* that the consequences of one's act may result in death does not satisfy the specific intent requirement for attempted murder.

Also, the instructions approved in *Morano* do not comply with the suggested Illinois Pattern Jury Instructions (IPI). The IPI instructions for murder state:

"A person commits the offense of murder when he kills an individual [without lawful justification] if, in performing the acts which cause the death,

■ he intends to kill or do great bodily harm to that individual or another;

or

■ he knows that such acts will cause death to that individual or another;

or

■ he knows that such acts create a strong probability of death or great bodily harm to that individual or another;

or

■ he [(is attempting to commit) (is committing)] the offense of _____." (IPI Criminal No. 7.01 (2d ed. 1971.)

The committee note to this instruction states:

"When the prosecution is for an inchoate offense (*i.e.,* attempt murder, solicitation to murder, conspiracy to murder), do not give subparagraphs [2], [3], or [4]. In addition, modify the murder definition in subparagraph [1] in attempt murder cases to require that the defendant had the intent to kill another. See *People v. Harris,* 72 Ill. 2d 16, 377 N.E.2d 28, 17 Ill. Dec. 838 (1978). For the attempt murder instruction, see Sample Instruc-

tion 27.02."

The suggested definitional murder instruction set out in IPI Criminal 2d No. 27.02 states:

"A person commits the offense of murder when he kills an individual if, in performing the acts which cause the death, he intends to kill that individual or another."

Accordingly, the committee authors of the IPI instructions clearly interpreted *Harris* as requiring elimination of all alternative murder instructions which reflect a mental state short of an intent to kill.

The instructions given in the case at bar are virtually identical to those found proper in *Morano* and its progeny. However, we believe the rule espoused in *Jones* and the IPI jury instructions to be the better approach. The *Morano* court acknowledged that the crime of attempted murder requires that the defendant act with "intent to kill." (*People v. Morano* (1979), 69 Ill. App. 3d 580, 585.) Yet, the court went on to erroneously conclude that knowledge that one's conduct creates a strong probability of death will satisfy the specific intent to kill requirement imposed by our attempt statute. In effect, the *Morano* decision found that knowledge and intent are equivalent and thus interchangeable mental states for attempted murder purposes.

■■ ■ Our criminal code contains separate statutory definitions for the four culpable mental states of intent, knowledge, recklessness, and negligence, with knowledge encompassing a distinct and less purposeful state of mind than intent. (See Ill. Rev. Stat. 1983, ch. 38, pars. 4—4, 4—7.) In so doing, our State legislature manifested a desire to treat intent and knowledge as distinct mental states when imposing criminal liability for conduct. Consequently, the difference between intent and knowledge should not be treated as a metaphysical distinction which can be ignored. Knowledge is not intent as defined by our statutes, and the jury instructions should reflect this distinction. Accordingly, we hold that in a prosecution for attempted murder, where alternative culpable mental states will satisfy the target crime of murder, but only one is compatible with the mental state imposed by our attempt statute, the incompatible elements must be omitted from the jury instructions. Accord, *State v. Huff* (Me. 1984), 469 A.2d 1251, 1253.

■ Based on the foregoing, we must reverse and remand for a new trial. The instructions given in the case at bar would have permitted a conviction upon a finding that defendant acted with knowledge that his actions created a strong probability of death even if the jury believed defendant did not intend to kill anyone. Since prior supreme court decisions have held that attempted murder requires the

mental state of intent to kill, the instructions given here were defective.

Accordingly, defendant's convictions are reversed and the cause remanded for a new trial.

Reversed and remanded.

McGLOON and O'CONNOR, JJ., concur.