THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS VELASCO, Defendant-Appellant.

First District (4th Division) No. 1—86—0918

Opinion filed June 8, 1989.—Rehearing denied July 13, 1989.

620

Paul P. Biebel, Jr., Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Lynda Peters, and Gail Feiger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial conducted in his absence, defendant was found not guilty of murder, but guilty of two counts of attempted murder. He was sentenced to concurrent terms of 30 years on the attempted murder convictions. On appeal, defendant contends that (1) he was improperly tried *in absentia*; (2) plain error occurred when the jury was incorrectly instructed on the mental state necessary to commit attempted murder; (3) he did not receive effective assistance of counsel; and (4) improper remarks by the trial judge constituted reversible error.

At trial, Able Vega (Able) testified that at approximately 8:30 p.m. on September 29, 1984, he, Enrique Vega (Enrique), Albino Correa (Albino) and Ruben Martinez (Ruben) drove in Ruben's car from their apartment to a wedding reception in a hall near 35th Street and Western Avenue in Chicago. They left the reception at midnight and walked to the nearby vacant lot where Ruben's car was parked. When they reached the car, Ruben was next to the driver's door, Able was beside him, Albino was next to the passenger's door and Enrique was near the rear of the passenger's side of the car. As Ruben was unlocking the door, three men, followed by at least another four or five men, none of whom he had seen at the reception, approached them and said "26 Ambrose," which Able understood to mean that the men were members of the "Ambrose" gang from 26th Street. Someone then said, "You are Latin Kings," a rival street gang. Able, who formerly belonged to a different gang, responded, "We are not Latin Kings." The men nevertheless began to punch him and his companions. Two or three men struck him in the face several times but he did not fight back and could not see what was happening on the other side of the car. He then heard a few shots from the other side of the car, and as his assailants ran, he looked back and saw a man coming around the rear of the car with a gun in his hand. He identified a lineup photograph of defendant as that

man. Defendant was four to five feet away when he extended his arm, pointed the gun toward him and Ruben, who was standing next to him, and fired one "hard shot" which struck Ruben in the lower left abdomen. Defendant then ran into an alley. When Able looked toward the other side of the car, he saw Albino holding his arm and Enrique lying face-up on the ground. He was unable to lift Enrique into the car because he was too heavy. Shortly thereafter, an ambulance arrived and transported Enrique, Ruben and Albino to the hospital; he accompanied the police to the police station. The following evening he viewed a lineup and identified defendant as the gunman and another man as one of the other assailants.

On cross-examination, Able stated that he and his companions did not know the persons whose wedding reception it was and had not been invited to it; they heard about it from friends and simply walked in.

Albino's testimony regarding the events prior to the shooting was substantially the same as Able's. Albino further testified that one of the men who accused them of being Latin Kings then stated that he and his group were "King Killers" and displayed the "[Latin] King Killers" hand signal. Although he and his friends denied being members of any gang, the men began punching Able. Meanwhile, 8 to 10 more men approached and surrounded the car. One of them began punching him and said "we are Ambrose of 26th and don't forget that." He heard three shots from his left side toward the rear of the car, whereupon his assailant stopped hitting him. He looked toward Enrique, who was standing near the rear of the car surrounded by at least six men and saw a hand six or seven feet away from him reach out with a small, dark gun and fire a shot, at which point most of the men began running away. The man with the gun, however, went around the rear of the car toward the driver's side. Albino ducked down alongside the car and then heard one last shot. After the crowd had dispersed, he stood up and saw Enrique lying on the ground. He then realized that he had also been shot. When the police arrived, they took him to a hospital where he underwent surgery for injuries from the bullet, which passed through his left arm and entered the left side of his chest.

On cross-examination, Albino stated that he did not have anything to drink before or at the wedding reception, and although the men who initiated the fight had also been at the reception, no one bothered or threatened him or his friends while they were there. He was unable to describe the gunman's face but recalled that he had a heavy build, was approximately 20 years old and 5 feet 9 inches or 5

feet 10 inches tall.

Ruben's testimony was also essentially the same as Able's and Albino's regarding the events that occurred and the description of the gunman. Ruben further testified that the gunman aimed the revolver and shot him in the stomach from a distance of four or five feet; and he identified defendant from a lineup photograph as the man who shot him. Ruben was hospitalized for two or three weeks during which time he underwent two surgical procedures necessitated by the bullet wounds.

Assistant Medical Examiner Yuksel Konakci testified that his post-mortem examination of Enrique revealed abrasions on the face and arms resulting from blunt trauma consistent with being punched. He concluded that Enrique died from wounds caused by a bullet which entered the left chest area and lacerated the stomach, liver, right lung and heart.

Officer Dennis Maderak, a gang crimes specialist, testified that he and his partner were riding in their squad car near 35th Street and Western Avenue when he saw a bottle being thrown and 20 to 25 people running toward a vacant lot. He then heard four shots and saw people running back toward the reception hall. They drove the squad car across the street, and as they were questioning some individuals whose car they had stopped, they saw Martin Velasco, defendant's brother, driving away in a car they recognized to be defendant's. They stopped him for questioning but were interrupted by an unidentified man who said that a man with a gun was hiding in some nearby bushes. When they reached the car, he saw two men on the ground bleeding and another man leaning against the car, bleeding from his mouth. They did not see anyone with a gun. The following evening, defendant was found hiding in a friend's apartment and arrested.

Detective Thomas O'Connor testified that the following day, he recovered a bluesteel, .32-caliber revolver with a black plastic handle from an alley approximately 50 yards from the scene of the shooting. It contained two bullets and four expended cartridges. When defendant was brought in for questioning, he at first denied any involvement in the shooting, stating that he was at his girlfriend's home at the time. However, later that evening, after being advised of conflicts between his alibi and statements made by his girlfriend and her mother, he admitted the shooting and agreed to give a written statement to an assistant State's Attorney. He and some fellow officers then gave defendant some pizza and a soft drink in a cup and left the room. A few minutes later, they heard a thumping noise and,

upon entering the room, saw that defendant, who was lying on the floor, had broken the glass cup and slit his left wrist with a piece of the handle. Defendant had also written messages on the wall and on a napkin stating, in substance, that he was "sorry" and wished "it never happened." They transported defendant to the hospital for treatment and then, at about 10 p.m., returned him to the police station where he made a court-reported statement to Assistant State's Attorney David Stoioff.

Stoioff testified that defendant was coherent and said he felt fine prior to making his statement. In that statement, which Stoioff read to the jury, defendant said that on the evening of the shooting, he had taken enough PCP "to get blown" and also smoked some marijuana. The combination of the drugs caused him to feel as if he were "moonwalking." He left his girlfriend's house at about 11:30 p.m. and drove to the wedding reception to find his brother, Martin, and drive him home because he knew, as a former gang member, that trouble sometimes erupted between invited and uninvited members of rival gangs at such events. When he arrived at the hall at about midnight, he noticed a crowd of people shoving, pushing and punching each other. He left his car running and double-parked on the street and ran toward the fight to look for Martin. As he was running, someone wearing a blue sweater thrust a small dark gun into his stomach area in a football-passing gesture. He juggled the gun as he continued to run but eventually gained control of it in his right hand. He considered putting the gun into his pocket but decided to carry it "in case something happened." He pushed through the crowd to the car and saw a few people standing against it. The person next to the driver's door then reached into his pocket. Not knowing whether the man was reaching for a key or a weapon, he said he didn't take any chances; he pointed the gun in the man's direction from about six feet away and started shooting "low down and level" in a "crazy wild," horizontal, swinging motion. He intended only to scare the man away, not to hurt him. He believed that he had fired only two shots and recalled hearing another shot from somewhere in the area. He did not see the bullet(s) hit the man nor did he see anyone fall. The other men were still standing side by side in the center of a crowd on the other side of the car. Suddenly, everyone began to run. He stood there for a moment in shock and then ran into an alley where he dropped the gun. As he was running, he saw some men holding bats coming toward him in a white Mustang, but a friend, Carlos, picked him up before he was "jumped" by the men.

Stoioff also identified photographs of the apology defendant had

written on the wall as well as the message on the napkin, which read, "I am sorry for what I did. I really did not mean to do it. Believe me, I feel hurt. Thank you for everything, for trying to help. Tell my girlfriend I love her and son [*sic*]."

Martin Velasco testified for the defense that he arrived at the wedding reception with some friends and fellow members of the "Ambrose 26" gang, between 10 and 10:30 p.m. and left at about midnight. Four men, whom he did not know, and a group of Ambrose 26 members also left the reception and walked toward the vacant lot. He then noticed defendant's car running and double-parked outside the hall. He walked toward the lot and saw the two groups of men fighting, "like a rumble." He ran back to defendant's car and got in it. He then heard four to six shots and saw defendant among the group of people running away from the lot. He drove defendant's car around the block two or three times and then stopped to speak with the police.

Defendant entered a plea of not guilty at his arraignment on December 7, 1984, and, on January 23, 1986, posted $25,000 bond. On February 4, he and his attorney appeared at a court proceeding at which trial was set, by agreement, for March 10. Defendant was then admonished as follows:

"THE COURT: Do you understand, Mr. Velasco, that you are now on bond[;] if on the 10th you should not be present your case would be tried anyway, do you know that?

DEFENDANT: I understand.

COURT: Before a jury. And if the jury found you guilty, you would be sentenced and thereafter when you were apprehended you would be brought directly to a penitentiary if that were the case, you would not come back to court. So, in other words, your case would go on whether you're here or not. So have that in mind."

On March 10, 1986, defendant failed to appear for trial. Defense counsel informed the court that defendant's parents had received a note from defendant indicating his intention to leave the jurisdiction and requested that the case be held on call for at least one day to allow counsel to attempt to locate defendant. The trial court granted the State's motion for bond forfeiture and issuance of an arrest warrant and, on the State's suggestion, continued the case for two days. When defendant did not appear on March 12, the trial court ruled, over defense counsel's objection, that defendant would be tried *in absentia*. Jury selection commenced on March 13, and on March 17, defendant was acquitted of the murder of Enrique but found guilty

of the attempted murders of Albino and Ruben. The trial court denied defense counsel's post-trial motion and, following a hearing, sentenced defendant to concurrent terms of 30 years on each attempted murder conviction. This appeal followed.

OPINION

Defendant first contends that he was improperly tried *in absentia* because notice of the trial date was not sent to him by certified mail as is required by statute. He maintains that he is therefore entitled to a new trial.

■ It is fundamental that an accused has the right to be present at all stages of his trial and to confront witnesses against him and that this right can be waived only by the defendant himself. (*People v. Owens* (1984), 102 Ill. 2d 145, 464 N.E.2d 252; *People v. Steenbergen* (1964), 31 Ill. 2d 615, 203 N.E.2d 404.) However, a defendant may not prevent his trial by voluntarily absenting himself from it, and where a defendant has been released on bond, he has not only the right but the duty to present himself for trial. (*Steenbergen*, 31 Ill. 2d 615, 203 N.E.2d 404; *People v. Davis* (1968), 39 Ill. 2d 325, 235 N.E.2d 634; *People v. Burns* (1983), 117 Ill. App. 3d 123, 453 N.E.2d 21.) To allow a defendant to impede trial proceedings by absenting himself therefrom would permit him to benefit from his own wrong (*Steenbergen*, 31 Ill. 2d 615, 203 N.E.2d 404). Thus, a defendant's voluntary absence from the court is deemed a waiver of his right to be present and permits the court to proceed with trial in the same manner and with like effect as if he were present (*Davis*, 39 Ill. 2d 325, 235 N.E.2d 634), providing that defendant's constitutional rights have been protected.

■ Illinois has enacted a legislative scheme designed to ensure that a trial *in absentia* is not held unless a defendant has made a valid waiver of his right to be present at trial and confront witnesses against him. (*People v. Watson* (1982), 109 Ill. App. 3d 880, 441 N.E.2d 152.) Section 113–4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 113–4(e)) (the Code) requires:

> "If a defendant pleads not guilty, the court shall advise him at that time or at any later court date on which he is present that if he *** is released on bond and fails to appear in court when required by the court that his failure to appear would constitute a waiver of his right to confront the witnesses against him and trial could proceed in his absence."

■ The circumstances under which a trial *in absentia* may be held are then set forth in section 115–4.1 of the Code (Ill. Rev. Stat.

1985, ch. 38, par. 115—4.1(a)), which provides in relevant part:

"When a defendant after arrest and an initial court appearance for a non-capital felony, fails to appear for trial, at the request of the State and after the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding trial, the court may commence trial in the absence of the defendant. *** Trial in the defendant's absence shall be by jury unless the defendant had previously waived trial by jury. *** If trial had previously commenced in the presence of the defendant and the defendant willfully absents himself for two successive court days, the court shall proceed to trial. *** The court may set the case for a trial which may be conducted under this Section despite the failure of the defendant to appear at the hearing at which the trial date is set. When such trial date is set the clerk shall send to the defendant, by certified mail at his last known address indicated on his bond slip, notice of the new date which has been set for trial. Such notification shall be required when the defendant was not personally present in open court at the time when the case was set for trial."

Relying primarily on *People v. Williams* (1987), 151 Ill. App. 3d 1010, 503 N.E.2d 1092, defendant argues that the requirement in section 115—4.1 of notice by certified mail of a trial *in absentia* is mandatory and that the failure to comply therewith is reversible error. He maintains that because notice by certified mail of his trial date was not sent to him, he is entitled to a new trial. We disagree.

In *Williams*, the defendant pleaded not guilty at his arraignment after which the case was set for trial readiness call on April 14 and for jury trial on April 21. When Williams did not appear for the April 14 readiness call, it was rescheduled for April 17 and his counsel was to provide Williams with notice at the address shown on his bond form. When Williams failed to appear again on April 17, the trial court granted the State's motion to proceed with trial *in absentia* on April 30, ordered a warrant for Williams' arrest and that the clerk of the court send notice of the new trial date to Williams. On April 29, the court learned that special notice of the new trial date had not been sent to Williams and, thus, directed the State's Attorney's office to attempt to personally serve defendant with special notice of the trial. The following day, notice of defendant's bond forfeiture was sent by certified mail but was returned marked "Moved, Left No Address." The court was advised that attempts to serve Williams with special notice had been unsuccessful because Wil-

liams had allegedly vacated his apartment two months earlier and moved out of State. Williams was then tried, found guilty and sentenced *in absentia.*

Citing *People v. Watson* (1982), 109 Ill. App. 3d 880, 441 N.E.2d 152, for the proposition that notice of a trial *in absentia* by ordinary mail is not an adequate substitute for notice by certified mail, the *Williams* court declared that certified mail notice of a trial *in absentia* is mandatory under section 115—4.1 and that the failure to comply with that requirement was reversible error necessitating a new trial. We do not reach the same conclusion in the case at bar.

First, we believe that the *Watson* decision does not serve as direct support for the holding in *Williams* because the facts of those cases are clearly distinguishable. In *Watson,* after the entry of defendant's plea of not guilty at his October arraignment, the trial court set the case "for jury trial on the January jury call." (*Watson,* 109 Ill. App. 3d at 883.) Following the arraignment proceeding, a written order was entered by the court and sent by regular mail to Watson, stating that the case was set for jury trial on January 11. When Watson failed to appear on that date, he was tried *in absentia* and found guilty of burglary and theft. On appeal, the *Watson* court noted that the provisions of sections 113—4(e) and 115—4.1 were enacted to ensure that such a trial would not be held unless the accused made a valid waiver of his right to be present at trial. The appellate court then reversed Watson's convictions, on the grounds that "[t]he trial court's statement at Watson's arraignment that the case was 'set for jury trial on the January jury call' was insufficient to set the date in open court in defendant's presence" (109 Ill. App. 3d at 283), and that section 115—4.1 therefore required that Watson be sent notice of that date by certified, not ordinary, mail. In other words, the certified mail requirement was triggered in *Watson* because the specific trial date, January 11, was not set in open court in Watson's presence. It was the absence of actual notice in the manner provided for in the statute which formed the basis of the *Watson* ruling that certified mail notice was required.

In the instant case, defendant was personally present in open court when the specific trial date was set. Thus, we do not agree, nor do we read *Watson* as holding, that additional notice by certified mail was required under section 115—4.1. To the extent *Williams* holds otherwise, we respectfully decline to follow that decision.

Moreover, the *Watson* court specifically noted that Watson was not admonished of his right to be present at trial or of the consequences of his failure to appear. Neither is there any statement in

*Williams* or facts from which we can infer that the trial court admonished Williams, at the arraignment proceeding when his case was set for trial, that his failure to appear on that date could result in his being tried *in absentia* as is required by section 113—4(e). In contrast to those cases, it is undisputed in the instant case that defendant was admonished that if he failed to appear on March 10, trial *would* proceed in his absence and that he affirmatively responded "I understand." Having been present in open court when his specific trial date was set and having been apprised of his right to be present and the consequences of his failure to appear, we find that there was compliance with the protective requirements of sections 113—4 and 115—4.1, and that the trial was therefore properly conducted in defendant's absence.

We are not persuaded otherwise by the fact that trial was continued for two days. Section 115—4.1 does not require repeat notice, by certified mail or otherwise, where the defendant was present in open court when the original trial date was set. The continuation of trial for two days, which is mandated only "if trial had previously commenced in the presence of the defendant" who thereafter willfully absents himself from it (Ill. Rev. Stat. 1985, ch. 38, par. 115—4.1(a)), was merely an additional safeguard of defendant's right to be present at trial which was ordered by the court, on the State's suggestion, to allow additional time within which to locate defendant or give him the opportunity to voluntarily present himself. See *People v. Porter* (1988), 170 Ill. App. 3d 835, 525 N.E.2d 211.

Defendant next contends that plain error occurred when the jury was incorrectly instructed on the mental state necessary for attempted murder in that the instructions given to the jury permitted it to convict him of attempted murder without finding that he acted with the specific intent to kill. The record reveals that the jury was given the following sequence of instructions.

First, the trial court gave the definitional attempted murder instruction which provides:

> "A person commits the crime of attempt when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder.
>
> The offense attempted need not have been committed."

The jurors were then given the attempted murder directive or what is commonly called the "issues" instruction:

> "To sustain the charge of attempt, the State must prove the following propositions:

*First*: That the defendant performed an act which constituted a substantial step toward the commission of the offense of murder; and

*Second*: That the defendant did so with the intent to commit the offense of murder."

The court then gave the full definitional murder instruction which states:

"A person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which cause the death,

he intends to kill or do great bodily harm to that individual or another; or

- he knows that such acts will cause death to that individual or another; or

he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

Finally, the jury was given the following "issues in murder" instruction:

"To sustain the charge of murder, the State must prove the following propositions:

*First*: that the defendant performed the acts which caused the death of Enrique Vega; and

*Second*: that when the defendant did so, he intended to kill or do great bodily harm to Enrique Vega; or

he knew that his acts would cause death or great bodily harm to Enrique Vega; or

he knew that his acts created a strong probability of death or great bodily harm to Enrique Vega.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

■ Defendant correctly asserts that nothing less than proof of specific intent to kill will support a conviction for attempted murder. (*People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Beverly* (1978), 63 Ill. App. 3d 186, 379 N.E.2d 753.) He argues that the failure to modify the definition of murder for purposes of the attempted murder charge so as to omit the alternative propositions, *i.e.*, that knowledge that his acts would cause death or great bodily harm or would create a strong probability of death or great bodily

harm, permitted the jury to convict him without finding that he acted with specific intent to kill.

Citing *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, in which the defendant was held to have waived review of this issue, the State asserts that any error here was similarly waived by defense counsel's failure to object to the instructions or tender any of his own. Defendant responds that the waiver rule does not apply in this case because (1) the evidence was closely balanced; (2) he has raised as a separate issue that his trial attorney, whose responsibility it was to object to the erroneous instructions, did not provide him with effective assistance of counsel; and (3) the *Roberts* case was decided prior to the revision of the Illinois Pattern Jury Instructions, which now require that a modified definitional murder instruction be given for attempted murder.

In *Roberts*, the court stated that "every error in the giving of an instruction impinges upon the right of a party to a fair trial" (75 Ill. 2d at 15) and that under Supreme Court Rule 451(c) "substantial defects [in instructions] are not waived by failure to make timely objections thereto if the interests of justice require." (58 Ill. 2d R. 451(c).) The court, however, declined to apply the plain error exception to the waiver rule in the *Roberts* case, ruling that, on the facts before it, the inclusion of mental states other than an intent to kill in the "nonmandatory definitional instruction" did not rise to the level of grave error because the evidence was not closely balanced. *Roberts*, 75 Ill. 2d at 14.

However, in *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, the supreme court, citing, *inter alia*, its decision in *Roberts*, stated:

> "The interests of justice demand that the rule of waiver be modified, in criminal cases, where necessary to ensure the fundamental fairness of the trial. [Citations.] Fundamental fairness includes, among other things, seeing to it that certain basic instructions *** are given. Instructions on the elements of the offense are among these basic instructions, and we have recognized that the trial court has responsibility for ensuring that they are given. [Citations.] The failure correctly to inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply. [Citations.]" 87 Ill. 2d at 222, 429 N.E.2d at 864.

In *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 699, 466 N.E.2d 662, an attempted murder case in which the jury was instructed that murder occurs when a person "intends to kill or do

great bodily harm," the court applied the reasoning in *Ogunsola* and declined to apply the waiver rule. In *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600, the jury was given attempted murder instructions virtually identical to those in the case before us. Although defendant did not raise the issue either at trial *or* on appeal, he did contend that his counsel was ineffective. In its review of counsel's performance, the *Jaffe* court *sua sponte* raised the issue of the erroneous instructions and considered it under the plain error rule. Because an error in mandatory jury instructions poses a potential for deprivation of substantial rights, we elect to consider the issue under the plain error doctrine.

■ Our supreme court has unequivocally held that specific intent to kill is an essential element of the offense of attempted murder and, correlatively, that a finding of nothing less than specific intent to kill will sustain a conviction for attempted murder. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 346; *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) As the supreme court in *Jones* stated, "[*k*]*nowledge* that the consequences of an accused's act may result in death (or grave bodily injury), *** is not enough; specific intent to kill is required [citation]. Both the indictment and the instructions must unambiguously reflect this." (Emphasis in original.) *Jones*, 81 Ill. 2d at 8-9, 405 N.E.2d at 345.

■ Where the defendant is tried for both murder and attempted murder at the same time, the trial court, for the purpose of the attempted murder charge (*People v. Beverly* (1978), 63 Ill. App. 3d 186, 379 N.E.2d 753), must give a separate instruction defining murder which limits the murder definition to acts committed with the specific intent to kill. *People v. Kraft* (1985), 133 Ill. App. 3d 294, 478 N.E.2d 1154; *People v. Beverly* (1978), 63 Ill. App. 3d 186, 379 N.E.2d 753; see Illinois Pattern Jury Instructions, Criminal, No. 6.05, Committee Notes (2d ed. 1981) (IPI Criminal 2d); IPI Criminal 2d No. 27.02 (which suggests the following definitional murder instruction for attempted murder: "A person commits the offense of murder when he kills an individual if, in performing the acts which cause the death, he intends to kill that individual or another").

■ Reviewing courts of this State have repeatedly stated that attempted murder instructions such as those given here, which include the full definition of murder (IPI Criminal 2d. No. 7.01), are erroneous. (*E.g., Jones*, 81 Ill. 2d 1, 405 N.E.2d 343; *Harris*, 72 Ill. 2d 17, 377 N.E.2d 28; *Trinkle*, 68 Ill. 2d 198, 369 N.E.2d 888; *People v.*

*Fields* (1988), 170 Ill. App. 3d 1, 523 N.E.2d 1126; *People v. Page* (1987), 163 Ill. App. 3d 959, 516 N.E.2d 1371; *People v. Cantu* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963; *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026; *People v. Cloyd* (1987), 152 Ill. App. 3d 50, 504 N.E.2d 126; *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600; *People v. Kraft* (1985), 133 Ill. App 3d 294, 478 N.E.2d 1154; *People v. Smith* (1984), 127 Ill. App. 3d 622, 469 N.E.2d 634; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.) Nevertheless, as the volume of cases in which this issue is presented demonstrates, attempted murder instructions which erroneously include the full definitional murder language inexplicably continue to be given.

The State does not argue that the instructions were not erroneous but, rather, that "assuming *arguendo* that the jury should have received a modified instruction *** any alleged error is harmless." The State maintains that an error in instructions will not justify reversal where, as here, the evidence of defendant's guilt is so clear and convincing that even if properly instructed the jury could not reasonably have found him not guilty. *People v. Jones* (1979), 85 Ill. 2d 1, 405 N.E.2d 343; *People v. Cloyd* (1987), 152 Ill. App. 3d 50, 504 N.E.2d 126.

As we noted in *People v. Gentry* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963, two lines of analysis have developed in cases in which this issue has been raised. Courts have reasoned that because intent is an essential element of the State's case, where intent is at issue, the giving of an erroneous instruction with respect to the mental state required to commit attempted murder deprives the jury of the legal tools necessary to determine defendant's guilt or innocence. The courts have therefore held the erroneous instruction to be plain error and reversed the convictions without extensive consideration of the evidence. *E.g., People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888; *People v. Cantu* (1987), 157 Ill. App. 3d 934, 510 N.E.2d 1183; *People v. Gentry* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963; *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026; *People v. Kraft* (1985), 133 Ill. App. 3d 294, 478 N.E.2d 1154; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.

The other line of analysis has been applied in cases where the defendant's intent is not at issue or is blatantly evident from the facts. In these circumstances courts have reasoned that even if properly instructed on the mental state necessary for attempted murder, the jury could not reasonably have found defendant not guilty. The

courts have thus held that the giving of an incorrect instruction, though error, was harmless error and have therefore upheld the defendants' convictions. *E.g., People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Page* (1987), 163 Ill. App. 3d 959, 516 N.E.2d 1371; *People v. Cloyd* (1987), 152 Ill. App. 3d 50, 504 N.E.2d 126; *People v. Smith* (1984), 127 Ill. App. 3d 622, 469 N.E.2d 634.

In the case at bar, defendant was charged with the attempted murder of two individuals and each conviction must be reviewed independently. Initially, we note that defendant's intent was one of the central issues in this case. Although defendant admitted limited participation in the shooting, he maintained that he did not intend to kill anyone. The question, then, is whether the State's evidence clearly and convincingly established otherwise.

With respect to the attempted murder of Ruben, the State's witnesses testified that defendant was approximately four feet from Ruben on the driver's side of the car when he pointed the gun toward Ruben and fired one "hard shot" toward Ruben's stomach. Ruben thereafter underwent two surgical procedures for injuries caused by the bullet. Defendant himself admitted that when the man on the driver's side (Ruben) reached into his pocket he "didn't take any chances" on whether Ruben was reaching for a key or a weapon and immediately pointed the gun at him from a distance of about five or six feet and shot "low and level." Although defendant also stated that he "freaked out" and fired in a horizontal swinging motion, "going crazy wild," and that his intent was to scare Ruben, not to hurt him, the largely undisputed circumstances of the shooting and the seriousness of Ruben's injuries are sufficient to clearly and convincingly establish defendant's intent to kill Ruben. Thus, we conclude that the jury could not reasonably have acquitted defendant of the attempted murder of Ruben even if it had been properly instructed on the issue of intent.

With regard to the attempted murder of Albino, however, we are constrained to conclude that the evidence was not so blatantly clear on the question of defendant's intent to kill Albino as to withstand the damage of the erroneous instructions. The record discloses that defendant's intent was raised as an issue in defense counsel's opening statement and remained at issue through the trial. The evidence presented by the State consisted of the testimony of Able, who stated that once his assailants began beating him, he was unable to see what was occurring on the passenger's side of the car where Enrique and Albino were standing. Able testified only that as he was being struck, he "heard a few shots" from the other side of the car.

At that point, his assailants ran, and it was only then that he saw defendant come around the rear of the car and shoot Ruben.

Ruben also testified that he did not witness the shooting of Albino. He merely stated that he was on the driver's side of the car when he heard two or three shots from the passenger's side of the car and saw Enrique fall.

According to Albino's own testimony, he was backed up against the front right side of the car and shielding his face when his assailant was punching him. He heard three shots being fired from his left and, when he looked up, saw a "hand with a gun" emerge from the crowd and reach out toward Enrique, who was standing near the rear of the car. He saw a bullet being fired and then saw a man he identified as defendant run around the rear of the car with a gun in his hand. He ducked alongside the car and, while in that position, heard one more shot. It was only after the group dispersed and Able came around to the passenger's side and told Albino to lift Enrique into the car that he realized that he, too, had been shot.

Moreover, defendant did not admit shooting either Enrique or Albino. According to his statement, he did shoot Ruben but at no time was he on the passenger's side of the car, where Albino and Enrique were standing. The credibility of defendant's statements on the issue of intent, like the testimony of any other witness, was a matter for the jury and they were free to disbelieve any or all of it. However, the significance of the jury having found the defendant not guilty of the murder of Enrique cannot be ignored. In our view, the jury's acquittal of defendant of the most serious charge, on which the jury was properly instructed, further supports our opinion that it was critical that they also be correctly instructed on the elements of attempted murder, not only because there was conflicting evidence but because defendant's intent was a central issue in this case.

Indeed, the record discloses that the first of the State's closing arguments was devoted almost exclusively to the issue of intent. Specifically, the assistant State's Attorney quoted that portion of the "issues in murder" instruction requiring proof that defendant "performed the acts which caused the death of Enrique Vega" and argued:

> "[T]here is no dispute *** that defendant fired the gun and that firing the gun caused the death of Enrique Vega. *There is no dispute that the act of firing the gun caused serious bodily harm to *** Able [sic] Correa and *** Ruben Martinez.* There is no dispute as to that. The evidence of that is overwhelming." (Emphasis added.)

The prosecutor then inaccurately stated that three eyewitnesses identified defendant as "the person who performed *these* acts" and that defendant himself made a statement wherein he "tells you that, yes, I did, in fact, fire the shots at *these guys*; that I drew a bead low in [*sic*] level and fired shots."

Counsel for the State then quoted what she referred to as "the second part of the definition of murder," but which is actually the standard "issues in murder" instruction (IPI Criminal 2d No. 7.02), which required the State to prove that defendant intended to kill or do great bodily harm to Enrique or acted with knowledge that the acts would cause or created a strong probability of causing death or great bodily harm to Enrique. Notwithstanding the instruction's specific and exclusive reference to Enrique, the prosecutor then argued:

> "Now [defense counsel] told you this [intent] was the only issue in the case. As you know now, *** the evidence in this case against the defendant is overwhelming. *** The witnesses testified how he stood four to seven feet away from *each one* of these individuals; how Able testified that he saw the defendant draw a bead on his partner, *Ruben* *** and how he was about five or six feet away and fired that gun; how it hit *Abel* [*sic*] *** in the chest area or hit *Ruben* *** in the chest area and the stomach area right where all the vital bodily organs are." (Emphasis added.)

The prosecutor also argued that the medical examiner's testimony concerning the trajectory of and damage done by the bullet which struck Enrique and the evidence that defendant shot him from a short distance "shows his intent to kill." Once again, however, the assistant State's Attorney commingled the evidence relating to each offense charged and failed to delineate what evidence of mental state(s) applied to which crime. She argued as follows:

> "After he pushed [the people in the crowd] away, *** he drew a bead and he fired low and level. He fired directly at *these individuals*. *** He told you about his intent. You know from his actions that he had intent to kill. ***
>
> Furthermore, he knew that his acts would cause death or great bodily harm to *this individual*.
>
> As to each one of these propositions, you will see in the second part here *** the State only has to prove one.
>
> It only has to be proven, one, that he intended to kill or cause great bodily harm or that he knew his acts would cause death or great bodily harm. We do not have to prove each of these. Just one is enough to show his intent.

I submit to you *** that we have proved each and every one because not only do you intend to kill someone, you come up and draw a bead on them low and level four or five feet away, but you also know when you do that act it creates a strong probability of death or great bodily harm.

You also know when you do that act it is going to cause death or great bodily harm when you aim at the interior, the vital organs in here. The evidence is overwhelming." (Emphasis added.)

We note that the evidence to which the prosecutor referred regarding shooting "low and level" from a distance of "four to five feet" was introduced with sole reference to the shooting of Ruben.

Toward the end of her argument, the prosecutor quoted the definition of attempted murder and remarked that there was "no dispute" that defendant shot Ruben and Albino. Counsel then quoted the issue in the attempt instruction and argued the distance from which defendant shot and the location and seriousness of the injuries as overwhelming evidence that "what he had intended to do was murder somebody." Counsel did not, however, define murder for purposes of attempted murder; and when we read the State's argument in its totality, we are not convinced that the jurors understood or could have understood that in order to convict defendant of attempted murder, it was necessary to find that he possessed nothing less than the intent to kill. Rather, it is our view that the jurors reasonably could have concluded that attempted murder can be committed if the defendant *knew* that his acts would or probably would cause *either* death or great bodily harm.

■ Following closing argument, the trial court gave exactly the same erroneous instructions quoted by the prosecutor in her closing argument and which are set out earlier in this opinion. The trial court bears the burden of ensuring that the jury is properly instructed (*People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487; *People v. Sanders* (1984), 129 Ill. App. 3d 552, 472 N.E.2d 1176); and, in fact, the trial judge advised the jurors at the outset of *voir dire* that it is the function of the court to instruct as to the applicable law and the "absolute duty of the jury to accept the law as it is stated in the instructions and then to follow it." The jurors, therefore, had no option but to apply the inapplicable murder instructions, which were erroneous as to the attempted murder charges, given by the trial court and explained by the prosecutor.

In summary, we cannot conclude that defendant's intent to kill Albino was so "blatantly clear" from the evidence to overcome the

damage of the erroneous instructions. We are unable to reasonably find that the jury would have found him guilty of the attempted murder of Albino even if they had been correctly instructed so as to find the error harmless beyond a reasonable doubt. We therefore hold that the misinstruction constituted plain error necessitating reversal and remandment for a new trial on the charge of the attempted murder of Albino Correa.

Defendant next contends that he did not receive effective assistance of counsel. Defendant raises numerous examples of allegedly incompetent performance by his trial attorney, most of which fall into one or more of the following general categories: defense counsel was unprepared for trial; conceded a major issue (defendant's participation in the shootings) in the case; failed to effectively cross-examine the State's witnesses; failed to make appropriate objections; failed to ensure that the jury was properly instructed; and overall did little to promote his own defense theory that defendant lacked the requisite intent to commit the offenses of murder and attempted murder. Defendant argues that as a result thereof, the State's case "with respect to the attempted murder charges was not subjected to any meaningful adversarial test.

■ To establish a denial of his constitutional right to representation by competent counsel, defendant must establish that his representation fell below an objective standard of reasonableness and that his attorney's shortcomings were so serious as to deprive him of his right to a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Johnson* (1989), 128 Ill. 2d 253, 265-70; *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600.) Defendant must clearly establish not only that his attorney was actually incompetent in the performance of his duties but also that were it not for that incompetence the outcome of the trial would likely have been different. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *Johnson*, 128 Ill. 2d 253; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246; *People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089.) In determining the adequacy of counsel, a reviewing court will not focus on isolated instances of alleged deficiencies but, rather, must consider the totality of the circumstances; a defendant is entitled to competent, not perfect, representation. (*McNutt*, 146 Ill. App. 3d 387, 496 N.E.2d 1089.) Neither will the court extend its review to areas involving the exercise of judgment, trial tactics or strategy, or indulge in speculation as to whether the outcome of trial *might* have been different had the representation been of higher caliber. *McNutt*, 146 Ill. App.

3d 357, 469 N.E.2d 1089.

In this regard, the record discloses that counsel filed motions to quash defendant's arrest and to suppress evidence, made attempts to locate defendant before commencement of the trial *in absentia*, objected to the trial proceeding in defendant's absence on the ground that the statute allowing for trials *in absentia* was unconstitutional as applied to defendant, participated in discovery, presented an opening statement in which he raised the critical issue of intent, cross-examined the State's witnesses, made numerous objections, moved for a directed verdict, presented defense witnesses, successfully objected to a circumstantial evidence instruction, made a closing argument which challenged the sufficiency of the State's case, and filed a post-trial motion.

▮ Furthermore, it is noteworthy that defendant qualifies his argument on this issue by contending that "with respect to the attempted murders the State's case was not subjected to a meaningful adversarial test." The significance of this qualification is, of course, that defendant was acquitted of the murder charge which, as we stated earlier, cannot be overlooked in reviewing the alleged errors in this case and what, if any, prejudice resulted therefrom. Moreover, defense counsel in this case was faced with the additional burdens of overcoming whatever prejudice the jurors may have formed against defendant by reason of his absence from trial and of defending a client who failed, by his absence, to assist in his own defense. Our reversal of defendant's conviction of the attempted murder of Albino does not alter our conclusion since, as we have discussed at length, the misinstruction of the jury in this case constituted plain error which cannot be said was attributable solely to defense counsel. In summary, we have reviewed the record in its entirety and conclude that defense counsel's overall performance constituted competent and effective representation.

Defendant's final contention is that the trial court committed reversible error and demonstrated his bias against defendant by certain improper remarks. The first comment of which defendant complains occurred during the cross-examination of Albino. The following colloquy took place:

> "DEFENSE COUNSEL: Do you know the signal for the Villalobos [street gang]?
> WITNESS: Yes.
> DEFENSE COUNSEL: What is the signal?
> THE COURT: Is that relevant here?
> PROSECUTOR: Object.

THE COURT: Is it relevant?

DEFENSE COUNSEL: Yes, it is relevant. He purports to indicate that he is not a gang member. It is funney [sic] he know [sic] the gang signals.

THE COURT: No, all of the streets for miles around know the hand signals.

DEFENSE COUNSEL: I don't know that this is true.

THE COURT: I can assure you that it is. This is a gang-dominated city. That is a matter we won't go into any further. The objection is sustained. Next question."

Defendant asserts that it is reversible error to make references to gang activity which prey upon the deep, bitter and widespread prejudice against street gangs, and that the remark here was especially egregious because it reflected the trial judge's bias against defendant, who had admitted former membership in a gang.

The State argues that this issue also should be considered waived by defendant's failure to object or include it in a post-trial motion. However, as stated in *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 449 N.E.2d 568, citing *People v. Sprinkle* (1963), 27 Ill. 2d 398, 189 N.E.2d 295, "given the fundamental importance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge, the waiver rule is applied less rigidly when the judge's conduct is the basis for the objection." 114 Ill. App. 3d at 936.

■ Every defendant, irrespective of the nature of the proof against him, is entitled to a trial that is free from improper or prejudicial comments by the trial judge. Although vested with wide discretion in the conduct of the trial, the trial judge must refrain from interjecting opinions or making comments or insinuations reflecting prejudice against or favor toward any party. Because jurors are generally watchful of the conduct of the trial judge, the court must exercise a high degree of care to avoid influencing the jury. *Sprinkle*, 27 Ill. 2d 398, 189 N.E.2d 295; *Heidorn*, 114 Ill. App. 3d 933, 449 N.E.2d 568; see *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380 (noting Supreme Court Rule 61 (107 Ill. 2d R. 61), and ABA Standards, Function of the Trial Judge §6.4 (1972)).

■ Nevertheless, for comments by the trial judge to constitute reversible error the defendant must show that the remarks were prejudicial and that he or she was harmed thereby. Even when the court's method of ruling on an objection indicates an opinion as to the validity of a party's position, the context of the judge's remark must be considered in determining whether prejudice resulted. *Heidorn*, 114 Ill. App. 3d 933, 449 N.E.2d 568.

■■ Although the court's reference to gang domination of the city might have been improper under other circumstances, in the case at bar the charges arose from a gang-related shooting. The record is replete with testimony regarding gang membership and activity. Defendant and Able both admitted that they were former gang members, and defendant's brother admitted being a member of the Ambrose 26 gang at the time of trial. Indeed, the line of questioning by defense counsel which prompted the remark concerned Able's familiarity with the hand signals of various street gangs, including the gang known as the "Villalobos" which, according to the evidence, was not involved in the incident leading to the shootings at issue. Thus, the court correctly ruled that the question was irrelevant; and it was only after defense counsel disputed that ruling that the remark complained of was made.

■■ The second comment was made as the trial court was discharging the jury. After thanking the jurors for their service, the trial judge added, "I must say that your verdicts will forever be a mystery to me, but they are your verdicts." Defendant argues that "when a trial court has displayed his prejudice against a defendant and his predisposition to act in a certain manner is evident, the case should be reassigned to a different judge upon remand."

We have examined the entire record carefully and determine that the trial court conducted the trial fairly and with particular concern that defendant's rights were protected in his absence. Consequently, we decline to enter any directions concerning the court assignment of this case upon remand.

For the reasons stated, we affirm defendant's conviction and sentence for the attempted murder of Ruben Martinez. However, we reverse the conviction for the attempted murder of Albino Correa and we remand this case for a new trial on that charge.

Affirmed in part; reversed in part and remanded for further proceedings.

JIGANTI, P.J., and JOHNSON, J., concur.