NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230656-U

NO. 4-23-0656

IN THE APPELLATE COURT

FILED
October 15, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MICHAEL BAKANA, | ) | No. 21CF125 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed defendant's conviction for attempted first degree murder but reversed his conviction for first degree murder and remanded for a new trial on that count. The court held that, where notice of defendant's trial date was not sent to defendant via certified mail, his trial *in absentia* was nevertheless proper because defendant was present in court when his trial date was set, and he was admonished that a trial could proceed in his absence if he failed to appear. However, the trial court erred where, despite instructing the jury on self-defense, it declined the defense's request to instruct the jury on second degree murder.

¶ 2       Following a jury trial *in absentia*, defendant, Michael Bakana, was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) (count I), attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2020)) (count IV), and aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2020)) (count V). After merging count V into count IV, the trial court sentenced defendant to 60 years in prison on count I and to a consecutive term of 50 years in prison on count IV. Defendant appeals, arguing (1) the court erred in commencing a trial *in absentia*

without complying with the notice requirement contained in section 115-4.1(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-4.1(a) (West 2022)) and (2) the court erred in failing to instruct the jury on second degree murder. We affirm in part, reverse in part, and remand for a new trial on the first degree murder charge.

¶ 3                                     I. BACKGROUND

¶ 4            Defendant was charged with the aforementioned offenses, two additional counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)) (counts II and III), and an additional count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2020)) (count VI) as a result of his involvement in a shooting on January 30, 2021. In the early morning hours on that date, defendant shot at Mariah Petracca and Bibianna Cornejo outside a bar in Bloomington, Illinois, killing Mariah.

¶ 5            Prior to trial, defendant's trial date was reset on several occasions. On March 10, 2022, while defendant was present with private counsel, the trial court initially set defendant's jury trial for September 19, 2022. Soon thereafter, defendant's private counsel withdrew, and a public defender was appointed. Accordingly, on June 30, 2022, while defendant was present, the court reset defendant's trial for October 17, 2022.

¶ 6            On September 8, 2022, defendant filed a motion seeking to proceed *pro se*, which the trial court granted. At a hearing on September 27, 2022, after defendant posted bond, the court placed defendant on GPS monitoring. At that time, the court informed defendant, "If you were to fail to show up for trial *** and the Court were to make a finding that you are willfully absencing [*sic*] yourself from trial that trial could take place in your absence." The court further informed defendant that if he failed to appear for trial, he would be waiving his rights to hear the evidence presented against him, to cross-examine witnesses, and to call his own witnesses. In response,

defendant asked how he would know when a hearing was scheduled, since several dates had been changed previously. The court responded that defendant would be informed of the next court date at the end of each hearing: "So as long as you show up you'll get notice in court of what your next court date is." Defendant requested a continuance to prepare for trial, which the court allowed. The court stated that the case would "be set for final pre-trial for December 8th at 11:00 in the morning. Case to be set on the trial calendar that commences December 12th." Thereafter, the court addressed defendant directly, stating, "On December 12th that is when we will start our jury trial, and we will try the case that week."

¶ 7    The trial court reiterated to defendant at hearings on October 24, 2022, and November 10, 2022, that the trial would proceed on December 12. However, on December 2, 2022, the court granted defendant's motion for a continuance, and the court set defendant's trial for January 9, 2023.

¶ 8    On December 27, 2022, new counsel entered his appearance for defendant and filed a motion to continue the trial. The trial court granted that motion and set the trial for March 13, 2023.

¶ 9    On February 17, 2023, defendant's counsel filed an answer to the State's motion for discovery. Therein, counsel asserted, *inter alia*, that defendant "may" rely on several defenses, including "Self-Defense pursuant to 720 ILCS 5/7-1" and "Requesting a Second-Degree Murder instruction pursuant to 720 ILCS 5/9-2."

¶ 10   On February 23, 2023, the trial court granted another continuance requested by defendant and set defendant's trial for May 8, 2023. Defendant was present when the court announced that date as the trial date. On May 1, 2023, defendant's counsel filed another motion to continue the trial, which the court denied.

¶ 11        At a hearing on March 2, 2023, the trial court reiterated to defendant that trial was set for May 8, 2023. The court also noted that defendant needed to be present at trial and that if the court found that he willfully absented himself from trial, it could go on in his absence.

¶ 12        The final pretrial hearing occurred on May 4, 2023. Defendant was present. The trial court again informed defendant that trial would proceed the following Monday, May 8, 2023, and if it found defendant willfully absented himself from trial, the trial could occur in his absence.

¶ 13        On May 8, 2023, defendant failed to appear for trial. A GPS tracker report indicated that the ankle strap to defendant's GPS tracker had been tampered with. Upon investigation, it was confirmed that the tracker had been cut off. The State asserted that trial should be held *in absentia*, as defendant willfully absented himself from trial by cutting the GPS bracelet off the morning of trial and choosing not to appear. Defendant's counsel responded that the "number one issue" was "whether or not there was going to be a self-defense claim that was going to be raised," and defendant needed to be present to testify on his behalf to establish self-defense. Counsel requested that the trial court "continue the trial in this matter" because there would be no prejudice to the State in doing so. The court recessed until noon, and upon reconvening, defendant still had not been located. Counsel requested a "continuance of the trial," and the court determined that the trial "will be continued until 9 o'clock tomorrow morning, and we'll see if we can locate [defendant] tonight. *** And if we're unable to locate him, I'll take up the State's request for trial *in absentia* at that point in time."

¶ 14        On May 9, 2023, defendant again failed to appear for trial. Accordingly, the trial court considered the State's motion for a trial *in absentia*. Defendant's counsel argued that section 115-4.1(a) of the Code (725 ILCS 5/115-4.1(a) (West 2022)) required that defendant be provided notice of the new date for trial. The State argued that (1) defendant was properly admonished that

trial could proceed in his absence, (2) defendant willfully absented himself from the proceedings, and (3) notice to defendant was not mandatory. The court concluded that defendant willfully absented himself from the proceedings, despite having been informed of (1) the trial date several times while he was present in court and (2) the possibility that the trial could occur in his absence. The court determined that the notice requirement of section 115-4.1(a) had been met and concluded that trial would proceed in defendant's absence. Jury selection commenced later that day. On May 10, 2023, the parties gave their opening statements, and the State commenced its case in chief. Defendant was not present.

¶ 15　　　　The following evidence was adduced at trial. Stephen Petracca, Mariah's father, testified that Mariah liked to drink alcohol, and when she got intoxicated, she would "get angry" and "argue a lot." She had "broke[n] a couple things" while intoxicated. As a result, Stephen was "afraid" that Mariah would "get hurt."

¶ 16　　　　Bibianna Cornejo testified that on the night of the incident, she and Mariah went to several bars in Bloomington. At the Spotted Dog, Bibianna had a "mini pitcher" of a Long Island iced tea or a mixed vodka drink. At another bar, Fat Jack's, both Bibianna and Mariah had two tequila shots and two mixed vodka drinks. Later, she and Mariah "bounced back and forth between Fat Jack's and Daddios quite a few times." Bibianna testified that they both had "a few more tequila shots at Daddios" and "a couple more of the mixed vodka drinks." Bibianna acknowledged that she was drunk. She remembered getting "kicked out" of Daddios because she and Mariah were dancing on a stage on which customers were not allowed. However, she tried to get back into the bar after realizing she left her phone inside. Bibianna remembered getting into an argument with somebody waiting in line to get into Daddios because that person "put[ ] a cellular device up to my face" and was "trying to record me." She remembered "swatting a phone from somebody's

hand," but she could not remember who that person was or whether they were male or female. She also acknowledged that she could not "remember anything" that happened outside except "feeling some type of pain in my back" before everything went "blank again." She did recall at one point looking up to see a bouncer and a police officer or EMT telling her to stay awake, but things "[went] black" again. According to Bibianna, her gunshot wounds left her with "40 percent use of [her] left arm," and she had wounds throughout her side, thigh, and back.

¶ 17            Matthew Kelpec testified that he was working at a bar near Daddios in the early morning on January 30, 2021. While taking a break, he noticed an argument outside Daddios between two females and a male. Kelpec heard a female say, " 'You ain't gonna do s***' " and also heard a female call another person "the N word." He then saw the male walk across the street to a car and reach into it without closing the door. The man's legs remained outside the vehicle. Kelpec saw the man "rummaging through [the car] as if he was looking for something" for a "few minutes" before walking back to Daddios. Kelpec testified that he did not see anything else because he went back inside. He did not recall seeing the man smoking a cigarette or vape pen.

¶ 18            Colton Parchert also witnessed an altercation outside Daddios and testified that it involved a man and two women arguing while Parchert was across the street. He noticed one of the women shove the man to "separate themselves" from him. The man then fired several shots at the women as they turned around, causing them to fall immediately. The man continued shooting while they were on the ground, then he dropped the gun "very, very quickly." Parchert ran toward the shooting to "stop the situation" and observed the man kneeling with his hands in the air saying, "oh, my gosh, what did I just do? What did I just do?" Parchert grabbed the man's arms, and the man was "completely compliant."

¶ 19         Deputy Seth Wiseman of the McLean County Sheriff's Office testified that he responded to a shooting at Daddios at approximately 1 a.m. on January 30, 2021. Upon arriving, he saw two females on the ground receiving aid; one woman was unresponsive. Defendant was being held on the ground by Parchert. Police recovered a 9-millimeter Ruger American handgun from the scene.

¶ 20         Dr. Scott Denton, a forensic pathologist with the McLean County Coroner's Office, testified that he conducted an autopsy of Mariah. Denton measured Mariah's height as five feet, four inches and her weight as 205 pounds. According to Denton, Mariah died of "multiple gunshot wounds" to the right side of her back. He saw no evidence of "close-range firing." Denton testified that three bullet wounds occurred at different heights on Maria's back, suggesting that her body was turning and falling when she sustained those wounds. The positioning of a fourth shot on the front of her body suggested that she was falling or on the ground when she sustained that wound. During cross-examination, Denton noted that he observed surveillance video of the shooting and the events leading up to it. Denton testified that before defendant shot at the women, Maria had pushed him toward the exterior brick wall of Daddios. Denton acknowledged that if a person's head hits a hard surface like brick hard enough, it can cause head trauma.

¶ 21         Detective Paul Jones of the Bloomington Police Department testified that a light pole near Daddios contained a Bloomington Police Department public safety camera that captured the shooting, in which 10 shots were fired. The video was entered into evidence and played for the jury, and this court has reviewed the video.

¶ 22         In the video, Mariah and Bibianna are walking around on the sidewalk outside Daddios. At the 12:33:39 a.m. timestamp, defendant and another individual approach a line to enter the bar. The other individual eventually enters the building without defendant, who continues

to wait in line. After several seconds, defendant appears to walk into the vestibule to enter Daddios such that he is not visible, and Mariah and Bibianna appear to follow him soon thereafter. At 12:42:55 a.m., Mariah, Bibianna, and defendant exit the vestibule and appear on the sidewalk in front of the bar. Defendant crosses the street away from the bar and is out of the frame for approximately 47 seconds before he reappears, walking back toward the bar from across the street. While waiting outside the building, Mariah, Bibianna, and defendant begin speaking to each other. During the conversation, Mariah and Bibianna use animated body language and hand gestures toward defendant for several seconds. They then begin to walk away. Defendant appears to pull out a phone and points it toward the women while approaching them. Mariah and Bibianna stop, and another conversation ensues with defendant. At 12:44:59 a.m., Mariah pushes defendant, who moves backward toward the exterior brick wall of the bar. Defendant then immediately pulls out a gun and fires eight successive shots at the women, who fall immediately. After a brief pause, defendant fires another two rounds at Bibianna while she is on the ground. Defendant then appears to drop his firearm and get on his knees with his hands in the air while others approach and apprehend him.

¶ 23    Jones testified that he interviewed defendant at the police station. At the time of the interview, Jones noticed that defendant had "slight swelling" on his right cheekbone. Jones noted that he advised defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). When asked if defendant wanted a mask, he answered that he did not, because he wanted to die. According to Jones, defendant never said anything about being hit in the head or feeling woozy. Additionally, defendant never mentioned that (1) any insults were directed toward him, (2) anyone spat on him, or (3) he was afraid or scared. Defendant did note that one insult was directed against his father, who passed away one month prior.

¶ 24        Jones testified that defendant told him he wanted to get out of his home because he was feeling "cooped up" due to the shutdown during the pandemic. He went to Daddios with a friend, where there was a line to get in. Defendant's friend "jumped the line," but defendant stayed outside to wait his turn. Defendant stated that a woman showed up and tried to convince the bouncer to let her in because she left something inside. Defendant told her that she needed to wait her turn and that he was not in the mood to argue because his father recently passed away. According to Jones, defendant told him that the woman "threatened me" and insulted his father by calling him a "p***." As a result, defendant said he walked to his car to "cool off," where he smoked his electronic cigarette for about five minutes. Jones noted, however, that the video of the incident showed that defendant was only gone for about 47 seconds. Defendant then returned to Daddios, where the women continued to insult him and his father. Defendant told Jones that the women then suddenly came toward him, which scared him, so he drew his pistol. Jones relayed that defendant, who was "around" 140 pounds, discussed past experiences in which he had been beaten up by women and resolved that he was "not going to be a punching board." Jones noted that, after he left the room, defendant stated, "I shoot that b*** and then he said f*** you."

¶ 25        Detective David Ashbeck testified that he was a crime scene detective with the Bloomington Police Department. Ashbeck explained that 10 9-millimeter cartridge cases were recovered from the scene of the shooting. Additionally, a loaded Ruger pistol magazine and an electronic cigarette were recovered from the center console inside defendant's vehicle.

¶ 26        Officer Christopher Miller of the Bloomington Police Department testified that he transported defendant to the police station to be interviewed. While defendant was transported, he was crying and sobbing and asked, "is she still alive?" Miller answered that he did not know, and defendant stated, "no no no, what did I do what did I do [*sic*]."

¶ 27    During the jury instructions conference, the State tendered two copies of the proposed jury instructions—one including instructions for self-defense and second degree murder and one without those instructions. Defendant's counsel requested a self-defense instruction. The trial court noted that it was "an incredibly close issue *** as to whether there is any evidence at all that would support the giving of a self-defense claim." However, the court determined that there was "some evidence that would support the giving of the instruction." Thereafter, the following exchange occurred:

"[THE COURT]: So with regard to the self-defense instruction, the Court will allow it to be presented, the affirmative defense, and allow it to go to the jury.

All right. With that being said, [prosecutors], is there a set of instructions at this point in time, or do we need to take some time to get those?

[PROSECUTOR]: We need to get into second-degree murder, Your Honor.

THE COURT: Well, second-degree murder is a situation to where that is a lesser included. A lesser included is something to where it is a fundamental right for the defendant. Fundamental right for the defendant, the defendant has to make the decision as to whether they seek to include a lesser included with the instructions. The defendant is not here to make that decision. That decision is waived in terms of second-degree. Counsel can't make that decision for [defendant].

[DEFENSE COUNSEL]: Your Honor, in our pre-trial meetings with [defendant], that was something that he was asking that we go ahead and request of the Court.

THE COURT: Denied. He has to be here so I can admonish him in terms of a second-degree. And I have to get it cleared on the record that he has made the decision personally that he wishes for a second-degree to be included. He is not here. He has waived the opportunity to present second-degree to the Court, to the trier of fact.

[PROSECUTOR]: Your Honor, there is a case *People vs. Washington*[, 2012 IL 110283,] that does say that if self-defense is included, then second-degree the imperfect defense, it is also included as well.

THE COURT: I understand if it is requested by the defense. And here we don't have anything that is requested by the defense because we don't have a defendant who can make that request. And so the Court's hands are tied in terms of being able to present the second-degree claim because [defendant] has willfully absenced [*sic*] himself from the trial and the Court can't address the issue with him. So, it is waived."

¶ 28    The jury found defendant guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. Defendant filed a motion for a new trial, arguing, *inter alia*, the trial court erred by (1) failing to give a second degree murder instruction where it provided the self-defense instruction to the jury and (2) proceeding with a trial *in absentia* without sending notice of the trial date to defendant by certified mail, as required by section 115-4.1(a) of the Code.

¶ 29    The trial court held a hearing on the motion for a new trial on July 24, 2023. Defendant, having been apprehended, was present. Following argument by counsel, the court denied defendant's motion. As to counsel's argument regarding the second degree murder

instruction, the court explained that, although "it was [defendant's counsel] that requested the second degree instruction be given," it ultimately "was the defendant's call to present that, and he wasn't here." Accordingly, the court affirmed its belief that it would have been inappropriate to allow a second degree murder instruction in defendant's absence. As to defendant's argument that counsel should have received notice prior to a trial *in absentia*, the court explained that defendant knew the trial date and received admonishments about what would happen if he failed to appear. The court further noted that it simply "delayed the start of the trial" in the hopes that defendant would be located.

¶ 30        After merging count V into count IV and conducting a sentencing hearing, the trial court sentenced defendant to 60 years in prison on count I and 50 years in prison on count IV, running consecutively to the sentence for count I.

¶ 31        This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33                             A. Trial *In Absentia*

¶ 34        Defendant argues that the trial court failed to comply with section 115-4.1(a) of the Code by commencing a trial *in absentia* without first sending notice of the trial date to his last known address. Defendant contends that, although he was present in court when his trial was set for May 8, 2023, "the trial did not in fact commence on that date." Rather, the court began "receiving evidence" on May 10, 2023. He argues that, as a result, the court "effectively reset the trial date when [he] was not present," such that he should have received notice of the new trial date before it began per section 115-4.1(a). The State responds that section 115-4.1(a) did not apply because (1) defendant was personally present when the May 8, 2023, trial date was set, (2) he was

advised on several occasions prior to that date that he could be tried *in absentia* if he failed to appear, and (3) the May 8, 2023, trial date was never reset.

¶ 35    Criminal defendants have a constitutional right to be present at all stages of their trial. *People v. Smith*, 188 Ill. 2d 335, 340 (1999). At the same time, defendants have the responsibility to attend all court proceedings. *Smith*, 188 Ill. 2d at 341. Though disfavored, a trial may proceed *in absentia* when the defendant has made a valid waiver of his or her right to be present. *People v. Watson*, 109 Ill. App. 3d 880, 882 (1982). While "whether a court erred in allowing a trial to proceed *in absentia* is reviewed for an abuse of discretion" (*People v. Hietschold*, 2024 IL App (2d) 230047, ¶ 22), a question of statutory construction, as is the case here, is reviewed *de novo* (*People v. Ramirez*, 214 Ill. 2d 176, 179 (2005)). "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent," which is best done by giving the statutory language its plain and ordinary meaning. *Ramirez*, 214 Ill. 2d at 179.

¶ 36    Section 115-4.1(a) of the Code provides as follows:

"When a defendant after arrest and an initial court appearance for a non-capital felony or a misdemeanor, fails to appear for trial, at the request of the State and after the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding trial, the court may commence trial in the absence of the defendant. *** The court may set the case for a trial which may be conducted under this Section despite the failure of the defendant to appear at the hearing at which the trial date is set. When such trial date is set the clerk shall send to the defendant, by certified mail at his last known address indicated on his bond slip, notice of the new date which has been set for trial. Such notification shall be

required when the defendant was not personally present in open court at the time when the case was set for trial." 725 ILCS 5/115-4.1(a) (West 2022).

¶ 37   In arguing that he was entitled to notice before his trial *in absentia* commenced, defendant relies upon *Ramirez*, *Watson*, and *People v. Smith*, 189 Ill. App. 3d 80 (1989). Defendant contends that these cases support the reversal of his convictions because he was never notified that the trial court would begin receiving evidence on May 10, 2023. However, defendant's reliance on these cases is misplaced.

¶ 38   In *Ramirez*, the defendant was advised on March 28, 1994, that he could be tried *in absentia* if he failed to appear for trial, which the trial court initially set for January 3, 1995. *Ramirez*, 214 Ill. 2d at 178. The State later moved for a continuance, and, while the defendant was present, the court noted only, " 'Set it for March, then, but no continuances.' " *Ramirez*, 214 Ill. 2d at 178. The defendant was not present when the court specifically set the trial date for March 6, 1995. *Ramirez*, 214 Ill. 2d at 181. On March 6, the defendant failed to appear for trial, and the court set the case for trial *in absentia* on April 3, 1995. *Ramirez*, 214 Ill. 2d at 178. Notice of the April 3, 1995, trial date was sent to the defendant via regular mail, but he failed to appear on that date. *Ramirez*, 214 Ill. 2d at 178. The defendant was tried *in absentia*, and he was convicted and sentenced. *Ramirez*, 214 Ill. 2d at 178. Our supreme court reversed the defendant's conviction, holding that "strict compliance with section 115-4.1(a)'s certified mailing requirement is a mandatory prerequisite to conducting a criminal trial *in absentia*, where the defendant was not personally present in open court when the case was set for trial." *Ramirez*, 214 Ill. 2d at 183. The court explained that, since the defendant "was not present when the actual March 6, 1995, trial date was set," strict compliance with section 115-4.1(a)'s certified mailing requirement was

mandatory. *Ramirez*, 214 Ill. 2d at 181, 183. Thus, notice via regular mail did not comply with section 115-4.1(a). *Ramirez*, 214 Ill. 2d at 184.

¶ 39    In *Watson*, the trial court stated in the defendant's presence only that the case was set for " 'jury trial on the January jury call,' " without providing a specific date. *Watson*, 109 Ill. App. 3d at 881. While the defendant was mailed two notices containing the January 11, 1982, trial date, they were not sent via certified mail. *Watson*, 109 Ill. App. 3d at 882-83. When the defendant failed to appear for trial on January 11, the court immediately proceeded with a trial *in absentia*, resulting in his conviction. *Watson*, 109 Ill. App. 3d at 882. This court reversed, concluding that the trial court's statement that the matter was set for jury trial " 'on the January jury call' " was insufficient to establish that a trial date was set in the defendant's presence, and the fact that the defendant's counsel had notice was not sufficient to comply with section 115-4.1(a). *Watson*, 109 Ill. App. 3d at 883.

¶ 40    In *Smith*, the defendant's trial was set for September 12, 1988, and when he appeared on that date, the matter was reset to September 19. *Smith*, 189 Ill. App. 3d at 82. On September 18, the defendant's counsel informed the defendant that his trial would not proceed on September 19, and while he need not appear, he was to call counsel to learn the new trial date. *Smith*, 189 Ill. App. 3d at 82. On September 19, the defendant did not appear, and the case was set for September 21. *Smith*, 189 Ill. App. 3d at 82. The defendant did not call counsel to learn the new trial date. *Smith*, 189 Ill. App. 3d at 82. On September 21, the defendant failed to appear for trial, and upon the State's motion for a trial *in absentia*, the trial court continued the matter to September 23 for a hearing on the motion. *Smith*, 189 Ill. App. 3d at 82. Following the hearing, the court granted the State's motion, and the defendant was convicted of one of the charged offenses. *Smith*, 189 Ill. App. 3d at 82. This court reversed that conviction, concluding that strict

- 15 -

compliance with section 115-4.1(a) was required; because no notice of the trial date was mailed to the defendant via certified mail, section 115-4.1(a) had not been satisfied. *Smith*, 189 Ill. App. 3d at 83.

¶ 41        *Ramirez*, *Watson*, and *Smith* are distinguishable. In *Ramirez* and *Watson*, the defendants were not informed of the specific dates of their trials while they were present in court but were told only that their trials would occur in " 'March' " (*Ramirez*, 214 Ill. 2d at 178) or " 'on the January jury call' " (*Watson*, 109 Ill. App. 3d at 881). Similarly, in *Smith*, the defendant was not present in court on September 19 when his trial date was set for September 21. *Smith*, 189 Ill. App. 3d at 82. Here, defendant *was* present when, on February 23, 2023, the trial court set his trial for May 8, 2023, and he was advised of that date when he was present for several subsequent hearings.

¶ 42        This case bears more resemblance to *People v. House*, 202 Ill. App. 3d 893 (1990), and *People v. Velasco*, 184 Ill. App. 3d 618 (1989). In *House*, the defendant was advised that his trial was set for November 12, 1986, and informed that he could be tried *in absentia* if he failed to appear. *House*, 202 Ill. App. 3d at 897-98. When he failed to appear on that date, the State filed a written motion for a trial *in absentia* on November 17, 1986. *House*, 202 Ill. App. 3d at 898. On November 20, 1986, following a hearing, the trial court granted the motion and tried the defendant *in absentia* on November 26, 1986. *House*, 202 Ill. App. 3d at 898. The defendant did not receive notice of the trial date via certified mail. *House*, 202 Ill. App. 3d at 900. After the defendant was convicted of the charged offenses, he appealed, arguing that his convictions should be reversed since he was not (1) present when the court set the November 26 trial date or (2) served with notice of the date by certified mail. *House*, 202 Ill. App. 3d at 901. We rejected this argument and concluded that no error occurred in trying the defendant *in absentia*. *House*, 202 Ill. App. 3d at

904. We reasoned that "certified mail notice would not be necessary" under section 115-4.1(a) because the defendant was present when the court set his trial date, he was admonished that he could be tried *in absentia* if he failed to appear, and the trial date was not reset. *House*, 202 Ill. App. 3d at 904.

¶ 43		Similarly, in *Velasco*, the trial court set the defendant's trial for March 10, 1986, while he was present and advised him that he could be tried in his absence if he failed to appear. *Velasco*, 184 Ill. App. 3d at 625. The defendant failed to appear on March 10, and the court continued the matter for two days. *Velasco*, 184 Ill. App. 3d at 625. When the defendant failed to appear on March 12, the court ruled that the defendant would be tried *in absentia*, and jury selection commenced on March 13. *Velasco*, 184 Ill. App. 3d at 625. After the defendant was convicted of two of the three charged offenses, he appealed, arguing that he was improperly tried *in absentia* because notice of the trial date was not sent to him by certified mail. *Velasco*, 184 Ill. App. 3d at 625-26. The appellate court rejected that argument, concluding that section 115-4.1(a) had been complied with. *Velasco*, 184 Ill. App. 3d at 629. The court explained that the defendant was personally present when the March 10 trial date was set and was advised that he could be tried in his absence if he failed to appear. *Velasco*, 184 Ill. App. 3d at 629. The court noted that this conclusion was not altered by the fact that the trial was continued for two days, since section 115-4.1 "does not require repeat notice, by certified mail or otherwise, where the defendant was present in open court when the original trial date was set." *Velasco*, 184 Ill. App. 3d at 629.

¶ 44		Here, because defendant was present when the trial court set his trial date for May 8, 2023, and because defendant was admonished on several occasions that a trial could proceed in his absence if he failed to appear, he was not entitled to any additional notice pursuant to section 115-4.1(a) upon his failure to appear for trial on May 8. This determination is not altered by the

fact that the court did not begin receiving evidence until May 10 because defendant was not entitled to "repeat notice, by certified mail or otherwise" under section 115-4.1(a). *Velasco*, 184 Ill. App. 3d at 629; see *People v. Johnson*, 2018 IL App (2d) 160674, ¶¶ 6-7, 17 (certified-mailing procedure was "not at issue" where, after the defendant failed to appear on the trial date that was set in his presence, the court proceeded with jury selection and then paused the proceedings until the following morning, at which time the defendant was still absent). As defendant was present when his trial date was set, "there was compliance with the protective requirements" of section 115-4.1(a). *Velasco*, 184 Ill. App. 3d at 629. Accordingly, the trial court did not violate section 115-4.1(a) by proceeding with a trial *in absentia* without first providing notice to defendant via certified mail.

¶ 45                    B. Second Degree Murder Instruction

¶ 46          Next, defendant argues that the trial court's failure to instruct the jury on second degree murder was erroneous because such an instruction was requested, and a second degree murder instruction is required under Illinois law when a self-defense instruction is also issued. Defendant asserts that, given the court's error, the jury was deprived of the opportunity to consider mitigating his first degree murder conviction to second degree murder, and therefore, he should receive a new trial on the first degree murder count with proper instructions. (We note that while defendant's brief generally requested as relief for this issue a "new trial with proper jury instructions," defendant's counsel clarified at oral argument that this issue applies only to defendant's conviction for first degree murder. Thus, counsel acknowledged that if this court found error only as to this issue, the appropriate relief would be a new trial solely on the first degree murder count.) The State concedes that the court incorrectly determined that defendant was required to request a second degree murder instruction personally. The State nevertheless argues

that defendant is entitled to no relief because (1) he did not specifically argue below that the court failed to issue the instruction after his *counsel* requested it and (2) any error in failing to give the instruction was harmless.

¶ 47     The proper standard of review of a trial court's determination of whether to give a jury instruction based upon its review of the evidence is abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. However, when—like here—the trial court's decision regarding whether to give an instruction involves a legal question, our review of whether the court's decision was correct as a matter of law is *de novo*. *McDonald*, 2016 IL 118882, ¶¶ 32, 41.

¶ 48     Second degree murder is a lesser-mitigated offense of first degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. A defendant can be convicted of second degree murder when the fact finder determines the State proved all the elements of first degree murder but a mitigating circumstance applies. *Wilmington*, 2013 IL 112938, ¶ 48. Mitigating circumstances include situations where, at the time of the killing, the defendant (1) acted under a sudden and intense passion resulting from serious provocation by the individual killed or (2) unreasonably believed the circumstances justified the killing in self-defense. 720 ILCS 5/9-2(a)(1), (2) (West 2020); 720 ILCS 5/7-1(a) (West 2020).

¶ 49     In *People v. Washington*, 2012 IL 110283, ¶ 56, the Illinois Supreme Court held that when a defendant is charged with first degree murder and the trial court instructs the jury on self-defense, the court must also instruct the jury on second degree murder if the defendant requests such an instruction. Thus, here, because the trial court instructed the jury on self-defense, it would have been required to instruct the jury on second degree murder if defendant had requested such an instruction. Notably, the parties do not dispute the fact that defendant's counsel requested a second degree murder instruction during the instruction conference. Indeed, the record establishes

that the court understood "it was [defendant's counsel] that requested the second degree instruction be given." However, the court refused to give a second degree murder instruction based upon its belief that defendant needed to be present to request the instruction personally, and since he was not, that instruction was foreclosed to him.

¶ 50        In *People v. Wilmington*, 2013 IL 112938, ¶ 1, the defendant was charged with first degree murder and concealment of a homicidal death. Following the presentation of evidence, the State presented a set of jury instructions that included a second degree murder instruction by a request from the defense. *Wilmington*, 2013 IL 112938, ¶ 18. Based upon the evidence presented, the trial court found that a second degree murder instruction was appropriate, but the record did not indicate whether the defendant understood it. *Wilmington*, 2013 IL 112938, ¶ 19. The jury ultimately convicted defendant of first degree murder and concealment of a homicidal death. *Wilmington*, 2013 IL 112938, ¶ 22.

¶ 51        On appeal to the supreme court, the defendant argued that his convictions should be reversed and the cause remanded for a new trial because, *inter alia*, the trial court gave a second degree murder instruction without having first asked if he understood it and agreed that it be tendered. *Wilmington*, 2013 IL 112938, ¶ 25. Our supreme court rejected this argument, concluding that the trial court did not err in failing to ask whether the defendant consented to the tender of a second degree murder construction. *Wilmington*, 2013 IL 112938, ¶ 52. The court based its holding on the distinction between a lesser-included and a lesser-mitigated offense. *Wilmington*, 2013 IL 112938, ¶ 48. The court explained that when a lesser-included offense instruction is tendered, a defendant exposes himself to possible criminal liability that he might otherwise avoid. *Wilmington*, 2013 IL 112938, ¶ 47. As a result, the defendant "has the right to decide whether to submit an instruction on a lesser-included offense at the conclusion of the evidence." *Wilmington*,

2013 IL 112938, ¶ 46. This entitles a defendant to an inquiry of defense counsel, in the defendant's presence, to determine whether (1) counsel advised the defendant of the possible penalties regarding the lesser-included offense and (2) whether the defendant agrees with tendering a lesser-included offense instruction. *Wilmington*, 2013 IL 112938, ¶ 47. However, a lesser-*mitigated* offense, unlike a lesser-*included* offense, does not expose a defendant to potential criminal liability that he might otherwise avoid, since a defendant can only be found guilty of second degree murder if the State has first proven all the elements of first degree murder. *Wilmington*, 2013 IL 112938, ¶ 48. Thus, the rationale attendant to lesser-included offense instructions does not apply to lesser-mitigated offense instructions. *Wilmington*, 2013 IL 112938, ¶ 48. Because second degree murder is *not* a lesser-included offense of first degree murder but a lesser-*mitigated* offense, the court held that the trial court did not err by giving the second degree murder instruction at defense counsel's request without first inquiring whether the defendant consented to that instruction. *Wilmington*, 2013 IL 112938, ¶¶ 48, 52.

¶ 52        In light of *Wilmington*, we conclude that the trial court's belief that defendant needed to be present to request a second degree murder instruction personally was erroneous. Instead, because second degree murder is a lesser-mitigated offense, the rationale underpinning lesser-included offense instructions does not apply. Accordingly, defendant's counsel was free to request the instruction even without the court inquiring of defendant whether he accepted its tender to the jury. Notably, the State agrees that counsel had the ability to request the second degree murder instruction and concedes that the court's refusal of that instruction was error.

¶ 53        However, the State asserts that defendant is nevertheless precluded from relief on this issue because he forfeited it. Specifically, the State argues that defendant failed to specifically argue to the trial court that the basis for its error in refusing to give a second degree murder

instruction was that *Wilmington* allows trial counsel to request such an instruction. The State asserts that, instead, the defense relied upon the argument that the record evidenced defendant's desire to request a second degree murder instruction, as the answer to the State's motion for discovery indicated that defendant intended to seek it. The State analogizes this circumstance to the invited error rule, arguing that defendant's failure to explicitly assert that *Wilmington* allowed defense counsel to request the instruction amounted to "acquiesce[nce] in the judge's analysis" and the manner in which the court proceeded. Defendant responds that he invited no error and did not forfeit this issue, as he has consistently argued that the court erred in rejecting the defense's request to instruct the jury on second degree murder.

¶ 54        " 'The rule of invited error or acquiescence is a procedural default sometimes described as estoppel.' " *People v. Brown*, 2023 IL App (4th) 220400, ¶ 29 (quoting *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)). In other words, "a party cannot complain of error that it brought about or participated in." *People v. Hughes*, 2015 IL 117242, ¶ 33. Pursuant to this doctrine, a defendant cannot request to proceed in one manner in the trial court and then contend on appeal that such course of action was in error. *Brown*, 2023 IL App (4th) 220400, ¶ 29. The rule alleviates the manifest unfairness that would otherwise result if a party were allowed a second trial upon the basis of an error that party injected into the proceedings. *Brown*, 2023 IL App (4th) 220400, ¶ 29.

¶ 55        Contrary to the State's position, we conclude that defendant did not forfeit his argument that the trial court erred in failing to give a second degree murder instruction. The record is clear that during the jury instructions conference, the defense requested such an instruction, noting that defendant had intended to seek it, but the court expressed its belief that defendant needed to be present to request the instruction personally. Notably, even the State attempted to

inform the court at that time that a second degree murder instruction was necessary because the court had allowed a self-defense instruction. Even so, the court refused to give the instruction. Counsel raised the issue in a motion for a new trial, again arguing that a second degree murder instruction was required because the court allowed a self-defense instruction. At the hearing on the motion for a new trial, the court explicitly acknowledged that counsel had requested the second degree murder instruction but nevertheless denied the motion, believing it could not have given the instruction while defendant was absent.

¶ 56        As evidenced by the record, counsel continuously sought a second degree murder instruction and at no point acquiesced to the trial court's decision not to grant the instruction. Moreover, the defense has consistently argued, including now on appeal, that the court was required to give a second degree murder instruction because the defense requested it in a case where the court had allowed a self-defense instruction. While the State argues that the defense forfeited the issue because it failed to explicitly argue that the court's error stemmed from its mistaken belief that counsel was not permitted to request a second degree murder instruction on defendant's behalf and instead focused its argument on the fact that the record evidenced defendant's intent to seek such an instruction, we believe the State exaggerates the difference between these two lines of reasoning. "A defendant fails to preserve an issue for review where the argument made in the trial court is 'wholly distinct' from the argument made on appeal, which often occurs when the arguments require different factual bases." *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 61. Despite the State's apparent claim otherwise, the arguments are not "wholly distinct." Under either theory, defendant's core claim is the same: the trial court erred in failing to give a second degree murder instruction that the defense requested in a case where the court allowed a self-defense instruction. The court had the opportunity to review the same essential

claim, especially considering the court acknowledged at the hearing on defendant's motion for a new trial that counsel requested the instruction at the jury instructions conference and nevertheless denied the motion. See *People v. Heider*, 231 Ill. 2d 1, 18 (2008) (the defendant preserved his argument for appeal where the trial court had an opportunity to review the defendant's claim and he was not asserting on appeal a completely different objection from the one raised in the trial court); *Jaimes*, 2019 IL App (1st) 142736, ¶ 61 (where arguments were not " 'wholly distinct' " and did not require different factual bases to resolve, the defendant did not forfeit an argument on appeal where the trial court had the opportunity to review the same essential claim). Accordingly, we find that this issue is preserved. We further note that forfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review otherwise forfeited issues. *People v. Rajner*, 2021 IL App (4th) 180505, ¶ 23. Thus, in light of the foregoing, even if defendant had forfeited this issue, we would exercise our discretion to review it because the core issue was squarely before the trial court.

¶ 57        As we previously noted, the State concedes that the trial court erred in refusing to tender a second degree murder instruction because counsel had the authority to request the instruction. As stated above, in light of *Wilmington*, we agree that the court erred in refusing to give a second degree murder instruction because the court allowed a self-defense instruction and the defense requested a second degree murder instruction. Accordingly, we accept the State's concession.

¶ 58        However, the State further alleges that any error in refusing to give a second degree murder instruction was harmless because the trial court erred in allowing a self-defense instruction in the first instance. Specifically, the State argues that the evidence at trial was not sufficient to warrant instructing the jury on self-defense, and therefore, defendant was not entitled to a second

degree murder instruction. We decline to consider this argument. The State's argument amounts to a *de facto* cross-appeal challenging the jury instructions given by the court. Such an argument is impermissible. See *People v. Castleberry*, 2015 IL 116916, ¶ 23 (noting that a *de facto* cross-appeal by the State was impermissible); *People v. Breeden*, 2016 IL App (4th) 121049-B, ¶ 61 (same).

¶ 59        Accordingly, we hold that the trial court erred as a matter of law by refusing the defense's request to instruct the jury on second degree murder with respect to the first degree murder count (count I) despite issuing a self-defense instruction. Thus, defendant's conviction for first degree murder must be reversed and the cause remanded for a new trial on that count. We note that because the evidence presented by the State was sufficient to sustain defendant's first degree murder conviction, there is no double jeopardy bar to defendant's retrial on that count. *People v. Nodine*, 2024 IL App (4th) 230269, ¶ 80.

¶ 60                              III. CONCLUSION

¶ 61        For the foregoing reasons, we affirm defendant's conviction for attempted first degree murder but reverse defendant's conviction for first degree murder and remand for a new trial on that count.

¶ 62        Affirmed in part and reversed in part; cause remanded.